Laura A. LAMBERT; Esther Ackley; Steve Belling; Pat Cooke; Letitia Selk; and Chuck Viltz, Plaintiffs–Appellees–Cross–Appellants,

v.

Barry ACKERLEY; William Ackerley; Seattle Supersonics, Inc., a Former Washington Corporation; SSI Sports, Inc., a Washington Corporation; and Full House Sports & Entertainment, Inc., a Washington Corporation, Defendants–Appellants–Cross–Appellees.

Nos. 96–36017, 96–36266 and 96–36267.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 6, 1998.

Decided Oct. 1, 1998.

Rehearing En Banc Granted and Opinion Withdrawn March 9, 1999.

Argued and Submitted April 22, 1999.

Filed June 10, 1999.

Spencer Hall, John W. Widell, Hall Zanzig Widell PLLC, Seattle, Washington, and Kathryn Y. Kim, Mundt MacGregor L.L.P., Seattle, Washington, for the plaintiffs-appellees-cross-appellants.

Eric M. Rubin, Walter Diercks, Rubin, Winston, Diercks, Harris & Cooke, Washington, D.C., Andrew L. Frey, Mayer, Brown & Platt, New York, New York, Robert P. Davis, Donald M. Falk, Miriam R. Nemetz, Mayer, Brown & Platt, Washington, D.C., for the defendants-appellants-cross-appellees.

Jennifer S. Goldstein, U.S. Equal Employment Opportunity Commission, Office of General Counsel, Washington, D.C., for amicus curiae.

Before: BROWNING, PREGERSON, REINHARDT, FERNANDEZ, RYMER, T. G. NELSON, TASHIMA, THOMAS, SILVERMAN, WARDLAW, and FLETCHER, Circuit Judges.

Opinion by Judge REINHARDT;
Partial Concurrence and Partial Dissent
by Judge RYMER.

REINHARDT, Circuit Judge:

This case presents a question of considerable importance to the workers in this circuit who rely on the protections afforded by the Fair Labor Standards Act ("FLSA" or the "Act"). We must resolve whether the anti-retaliation provision of that Act protects employees who complain to their employers about wage and hour violations. Based on the guiding purpose and design of the FLSA and the language of the statute, we join six other circuits and hold that complaints made to employers are within the ambit of the FLSA's anti-retaliation clause. Because we reject the other arguments that the defendants have raised on appeal, we affirm the decision of the district court.

## I.

### Facts and Procedural History

The plaintiffs in this action are six former ticket sales agents of the Seattle SuperSonics, a National Basketball Association team. As "account executives" for the Sonics, the plaintiffs were responsible for selling season tickets, multi-game packages, and group-ticket packages. They also were responsible for staffing a season ticket information booth at Sonics basketball games. Beginning in 1991, the agents were paid a base salary of $13,000, and received the remainder of their compensation through commissions earned for their ticket sales. Rather than paying overtime in accordance with the actual number of hours worked by each employee, the Sonics paid each account executive $2000 per year for "overtime." Under the Sonics' plan, each employee was paid $166.67 per month regardless of the overtime actually worked by the account executive.

In 1993, however, apparently because the Sonics had sold almost all of their tickets, the account executives' workweek was reduced to 20 hours, and the monthly "overtime" payments were discontinued. In 1994, plaintiff Laura Lambert became concerned that she and her fellow account executives had not been paid for all of the overtime hours they had actually worked. Accordingly, in May of 1994, she left a note with Sonics Controller Brian Dixon requesting a meeting to discuss overtime wages. Lambert also telephoned the United States Department of Labor and requested information regarding federal overtime laws. After speaking with the Labor Department, Lambert raised the issue of unpaid overtime with the Sonics head of ticket sales, Bob Boustead. Boustead told Lambert that the overtime question was a "dead issue." According to Lambert's testimony, Boustead also said "[i]f you want to sue the Sonics, go ahead and do us all a favor." (SER 190).

On May 20, 1994, the Department of Labor informed Lambert that the Sonics' overtime scheme did in fact violate the overtime provisions of the Fair Labor Standards Act. Lambert told Dixon of the Labor Department's conclusion and Dixon, according to Lambert's testimony, told her that "his hands were tied" because William Ackerley (Chief Operating Officer of Ackerley Communications, Inc., the corporate parent of the defendant corporations) "will not pay overtime and doesn't care what the laws are." (SER 192–94). Dixon then told Lambert that if she continued to press for her statutory right to overtime pay:

> you will definitely not have a job here, you will be fired. The decision is up to you. Everyone else in the office will love you, but you are jeopardizing your job. Is it worth it to you for a thousand dollars?

(SER 195–96).

In June 1994, the account executives decided that Lambert and plaintiff Chuck Viltz should be their representatives in dealing with the Sonics management. (SER 202). Boustead confirmed that "Chuck and Laura were the spokespersons for the sales folks." (SER 265). Around this same time, Lambert hired an attorney. On June 17, 1994, Lambert's attorney sent Barry Ackerley (CEO and

Chairman of the Board of Ackerley Communications) a letter requesting that the Sonics pay Lambert and the other account executives overtime as required by law. The letter also specifically requested that Ackerley instruct his managers "to refrain from retaliation or threats of retaliation against Ms. Lambert and other employees." (ER 118). On July 6, 1994, Lambert's attorney delivered a complaint for unpaid overtime wages to the Sonics.

The Sonics eventually settled the overtime claims with Lambert, and paid the other account executives the amounts due them for overtime. Less than a week later, on October 12, 1994, John Dresel, the Sonics Executive Vice President, wrote a memo to William Ackerley informing him that he was planning to lay off all of the account executives by November 30, 1994. In October of 1994, Full House Sports & Entertainment, Inc. was organized to, among other things, run the Sonics ticket sales operations. Dresel was named as President. In December 1994, Dresel discharged nine of the ten account executives, including the six plaintiffs here. The one sales agent not discharged was the one agent who had never complained about the overtime violations. (SER 271–274).

Following their discharge, the plaintiffs filed suit, alleging that they had been fired in retaliation for their complaints about the defendants' failure to comply with federal overtime requirements, in violation of the FLSA, 29 U.S.C. § 215(a)(3), and in violation of the public policy of the state of Washington. Wash. Rev.Code § 49.46.100(2). Following a three-week trial, the jury returned a verdict for the plaintiffs on both the federal and state causes of action and awarded $697,000 for lost wages, and $75,000 to each plaintiff for emotional distress. The jury further awarded $12 million in punitive damages on the FLSA claim.[1] The defendants

moved for judgment as a matter of law, or in the alternative for a new trial and/or a remittitur of damages. The district court remitted the punitive damages award to $4,182,000, but denied all other defense motions. The district court also awarded the plaintiffs $389,117.50 in attorneys' fees, and later awarded them an additional $44,075 in supplemental fees in connection with the post-trial motions.

The defendants appealed the district court's denial of their motion for judgment as a matter of law, and a three-judge panel of this court reversed with respect to the federal claim on the ground that the anti-retaliation provision of the FLSA does not apply to complaints made to an employer. The panel then affirmed in part on the state claim and remanded it for further proceedings. *See Lambert v. Ackerly*, 156 F.3d 1018 (1998), *withdrawn and reh'g en banc granted*, 169 F.3d 666 (9th Cir.1999). The plaintiffs filed a suggestion for rehearing en banc, and a majority of the non-recused active judges of this court voted to rehear the case en banc in order to consider the scope of the anti-retaliation provision of the FLSA. Having withdrawn the panel opinion, we now affirm the judgment of the district court on the federal cause of action.[2]

## II.

### The Reach of the Anti–Retaliation Provision

The Fair Labor Standards Act anti-retaliation provision provides that it is unlawful:

[T]o discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about

---

1. The district court's jury instruction allowed punitive damages to be assessed only for a violation of the federal law. (SER 33).

2. Because we uphold the judgment in favor of the plaintiffs under the FLSA, and because

greater relief was awarded under that statute than is available under the state cause of action, we need not determine the validity of the judgment on the state claim.

to testify in any such proceeding, or has served or is about to serve on an industry committee.

29 U.S.C. § 215(a)(3). In this case, we must determine whether the FLSA's prohibition on terminating an employee who has "filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter" protects an employee who complains to his employer about violations of the Act. The district court, in denying the defendants' motion for judgment as a matter of law, held that the statute extends protection to employees who make such complaints. The defendants contend, to the contrary, that the anti-retaliation provision protects only those employees who file formal proceedings with the Department of Labor or in a federal court. Our court has never before addressed this question, although we did reserve it in *Knickerbocker v. City of Stockton,* 81 F.3d 907, 912 n. 3 (9th Cir. 1996). To date, however, seven other Circuits have reached the specific question raised here. The First, Third, Sixth, Eight, Tenth, and Eleventh circuits have all held that complaints similar to, and even far more "informal" than those lodged by the plaintiffs here entitle the employee to coverage under the anti-retaliation provision of the FLSA. *See Valerio v. Putnam Assocs. Inc.,* 173 F.3d 35 (1st Cir.1999); *Brock v. Richardson,* 812 F.2d 121, 124–25 (3d Cir.1987); *EEOC v. Romeo Community Schools,* 976 F.2d 985, 989 (6th Cir.1992); *Brennan v. Maxey's Yamaha, Inc.,* 513 F.2d 179, 181 (8th Cir.1975); *Love v. RE/MAX of Am., Inc.,* 738 F.2d 383, 387 (10th Cir.1984); *EEOC v. White & Son Enterprises,* 881 F.2d 1006, 1011 (11th Cir.1989). The Second Circuit is the only circuit to reach the contrary conclusion, although it did so in a case in which the only complaint made was an oral complaint to a supervisor that a pay disparity was "not fair." *See Lambert v. Genesee Hosp.,* 10 F.3d 46, 55 (2d Cir.1993).

Over fifty years ago, the Supreme Court determined the approach that must be followed in construing the provisions of the Fair Labor Standards Act. A number of the other circuits have explicitly followed that approach. It is a simple one, often used in construing statutes designed to protect individual rights. In *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 597, 64 S.Ct. 698, 88 L.Ed. 949 (1944), the Court explained that because the FLSA is a remedial statute, it must be interpreted broadly. As the *Tennessee Coal* Court wrote:

> [The FLSA is] remedial and humanitarian in purpose. We are not here dealing with mere chattels or articles of trade but with the rights of those who toil.... Those are rights that Congress has specifically legislated to protect. *Such a statute must not be interpreted or applied in a narrow, grudging manner.*

*Id.* (emphasis added). More specifically, in *Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 292–93, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960), the Court explained that Congress intended the anti-retaliation provision of the FLSA to provide an incentive for employees to report wage and hour violations by their employers. As the Court wrote:

> For weighty practical and other reasons, Congress did not seek to secure compliance with prescribed standards through continuing detailed federal supervision or inspection of payrolls. Rather it chose to rely on information and complaints received from employees seeking to vindicate rights claimed to have been denied.... [I]t needs no argument to show that fear of economic retaliation might often operate to induce aggrieved employees quietly to accept substandard conditions.

*Id.* at 292, 80 S.Ct. 332.

The implication of *Tennessee Coal* and *Mitchell* is clear. Based on the principles illustrated by these two cases, the Third Circuit, for example, concluded that "the [Supreme] Court has made clear that the key to interpreting the [FLSA's] anti-retaliation provision is the need to prevent employees' 'fear of economic retaliation' for voicing grievances about substandard conditions." *Brock,* 812 F.2d at 123–24.

The Eleventh Circuit has similarly held that "[t]he anti-retaliation provision of the FLSA was designed to prevent fear of economic retaliation by an employer against an employee who chose to voice such a grievance," and that "[b]y giving a broad construction to the anti-retaliation provisions to include [informal complaints made to employers], its purpose will be further promoted." *White & Son*, 881 F.2d at 1011. Most recently, the First Circuit reached the following conclusion:

> A narrow construction of the anti-retaliation provision could create an atmosphere of intimidation and defeat the Act's purpose in § 215(a)(3) of preventing employees' attempts to secure their rights under the Act from taking on the character of 'a calculated risk.' Such circumstances would fail to 'foster a climate in which compliance with the substantive provisions of the Act would be enhanced.' Hence we, like many of our sister circuits, conclude that the animating spirit of the Act is best served by a construction of § 215(a)(3) under which the filing of a relevant complaint with the employer no less than with a court or agency may give rise to a retaliation claim.

*Valerio*, 173 F.3d at 43 (*quoting Mitchell*, 361 U.S. at 292, 293, 80 S.Ct. 332).

We agree with the other circuits that have given a broad construction to the statutory provision. The FLSA's anti-retaliation clause is designed to ensure that employees are not compelled to risk their jobs in order to assert their wage and hour rights under the Act. Construing the anti-retaliation provision to exclude from its protection all those employees who seek to obtain fair treatment and a remedy for a perceived violation of the Act from their employers would jeopardize the protection promised by the provision and discourage employees from asserting their rights. As is obvious from this very case, such a construction would leave employees completely unprotected by the FLSA against retaliatory discharge when they complain to their employers about violations of the Act—exactly what the anti-retaliation provision was designed to prevent. We hold, therefore, that in order for the anti-retaliation provision to ensure that "fear of economic retaliation" not "operate to induce aggrieved employees quietly to accept substandard conditions," *Mitchell*, 361 U.S. at 292, 80 S.Ct. 332, it must protect employees who complain about violations to their employers, as well as employees who turn to the Labor Department or the courts for a remedy.

Although possibly subject to differing interpretations, the language of § 215(a)(3) is fully consistent with this conclusion. By its terms, the anti-retaliation provision prohibits retaliation against an employee who has "filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3). First, we conclude that "any complaint" related to the FLSA includes complaints made to employers. If "any complaint" means "any complaint," then the provision extends to complaints made to employers. Second, we are also convinced that the statutory term "filed" includes the filing of complaints with employers. When drafting the language of § 215(a)(3), it is reasonable to assume that Congress was aware of the practice, in many union and non-union workplaces, of requiring employees to "file" grievances and complaints with their union and/or employer before instituting any further internal or external proceedings. Given the widespread use of the term "file" to include the filing of complaints with employers, it is therefore reasonable to assume that Congress intended that term as used in § 215(a)(3) to include the filing of such complaints. Finally, we note that § 215(a)(3) protects employees who file complaints "under or related to this chapter." The defendants' construction of the statute would render the "or related to" language superfluous. As we read the statute, complaints filed "under" the FLSA are those complaints provided for in the Act, i.e., those complaints filed with the Department of Labor or the federal court as specified in the Act. Complaints that are not "under" the FLSA but are "related to"

it, on the other hand, are those complaints filed outside of court and the Department of Labor that relate to the subject matter of the FLSA, for example, those complaints filed *with an employer*. In sum, the statutory grant of protection to employees who "file[ ] any complaint" "related to" the FLSA extends to employees who complain to their employer about an alleged violation of the Act.[3]

The defendants rely on the fact that Title VII's anti-retaliation provision, 42 U.S.C. § 2000e–3(a), contains language broader in scope than the language contained in the FLSA provision. In *Genesee*, the Second Circuit reached the conclusion that the FLSA does not protect employees who complain internally to their employers by contrasting § 215(a)(3) with Title VII's

anti-retaliation provision. *See Genesee*, 10 F.3d at 55. With all due respect to the Second Circuit, we disagree that the breadth of Title VII's anti-retaliation provision dictates the construction we should give the FLSA provision. The FLSA was drafted some sixty-two years ago, at a time when statutes were far shorter and less detailed, and were written in more general and simpler terms. The fact that Congress decided to include a more detailed anti-retaliation provision more than a generation later, when it drafted Title VII, tells us little about what Congress meant at the time it drafted the comparable provision of the FLSA. In short, we find the view suggested by the defendants—that Congress' choice of words in 1964 can resolve the meaning of words chosen in 1937—to be unpersuasive.[4]

---

3. The construction we give § 215(a)(3) is also dictated by our decision in *MacKowiak v. University Nuclear Sys., Inc.*, 735 F.2d 1159 (9th Cir.1984), where we held that a similar, although facially more restrictive, anti-retaliation provision of the Energy Reorganization Act ("E.R.A.") extended protection to employees filing complaints with an employer. The E.R.A. provision applied when an employee:
 (1) commenced, caused to be commenced, or is about to commence or cause to be commenced a proceeding under this chapter ...;
 (2) testified or is about to testify in any such proceeding or;
 (3) assisted or participated or is about to participate in any manner in such a proceeding.
 42 U.S.C. § 5851(a)(1982). In reaching our holding in *MacKowiak*, we noted that the Energy Reorganization Act's anti-retaliation provision has the "broad, remedial purpose of protecting workers from retaliation." *Id.* at 1163. As we have shown, the same is true of the FLSA. *See, e.g., Tennessee Coal*, 321 U.S. at 597, 64 S.Ct. 698. The *MacKowiak* court also observed that "[i]f the regulatory scheme is to function effectively, inspectors must be free from the threat of retaliatory discharge for identifying safety and quality problems." 735 F.2d at 1163. The same need to be free from threats of retaliatory discharge exists with respect to the FLSA, if that statute is to "function effectively." *Id.* It follows, a fortiori, from our holding in *MacKowiak* that a statute like the FLSA that (1) expressly covers the filing of complaints, and is not limited to the institution of actual proceedings, and (2) applies to actions related to, and not just

commenced under, the Act covers internal complaints filed with employers.

4. Equally unpersuasive is the defendants' argument regarding the 1985 amendments to the FLSA. *See* 99 Stat. 787 § 8. The amendments, passed in response to the Supreme Court's determination that the FLSA applies to states and municipalities, *see Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), contained a provision dictating that states and municipalities may not discriminate against any employee "because on or after February 19, 1985 [the date of *Garcia*], the employee asserted coverage under section 7 of the Fair Labor Standards Act." The amendment went on to state that "[t]he protection against discrimination afforded by the preceding sentence shall be available after August 1, 1986, only for an employee who takes an action described in section 15(a)(3) of such Act." The defendants argue that the phrase "asserted coverage" expanded the range of parties to whom protected complaints could be made (e.g., employers, not just courts and agencies), and that such expansive coverage terminated on August 1, 1986. We disagree. The most natural reading of the amendment is that it temporarily extended protection to employees who "asserted" that their state and municipal employers were "cover[ed]" by the Act during the initial period following a controversial and hotly disputed Court decision. For example, the amendment extended protection to union representatives and others who, during the post-*Garcia* period of adjustment, attempted to persuade a local government agency

Our decision today is in line with the routine construction given similar anti-retaliation provisions by the federal courts of appeals. In *Phillips v. Interior Bd. of Mine Operations Appeals,* 500 F.2d 772 (D.C.Cir.1974), for example, the D.C. Circuit held that the whistle-blower provision of the Federal Mine Health and Safety Act ("FMHSA") covers complaints made to employers. The FMHSA provision is analogous to, although again more limited than, the FLSA provision.[5] Despite the absence of express language in the statute extending protection to employees who complain to their employer, the D.C. Circuit held that "the coverage of the Act begins when the miner notifies his *foreman* and/or safety committeeman of possible safety violations." *Id.* at 778 (emphasis added).[6]

In *Rayner v. Smirl,* 873 F.2d 60, 64 (4th Cir.1989), the Fourth Circuit reached the same conclusion with respect to the Federal Railroad Safety Act, a statute with an anti-retaliation provision indistinguishable from the FLSA's.[7] Again, although the anti-retaliation provision of this Act lacked explicit reference to complaints made to employers, the court concluded that it protected such complaints. As the *Smirl* court wrote, "[t]he distinction between intra-corporate complaints and those made to outside agencies is ... an artificial one. Both serve to promote rail safety and both are within the contemplation of § 441." *Id.* at 64.

In *Passaic Valley Sewerage Comm'rs v. Department of Labor,* 992 F.2d 474 (3rd Cir.1993), moreover, the Third Circuit held that the Clean Water Act's whistle-blower provision extended protection to employees who complain to their employer. *See id.* at 478.[8] In an eloquent decision, the

---

that it was subject to the FLSA. Following the initial period of adjustment, however, only complaints regarding specific violations of the Act were covered, i.e., complaints covered by § 215(a)(3). Contrary to the defendants' assertion, therefore, the 1985 amendment effected a temporary expansion of the *subject matter* of complaints protected by the Act. The amendment said nothing, however, about the range of parties to whom protected complaints could be made. Accordingly, the amendment is irrelevant to our analysis here.

5. The FMHSA provision applies on its face only to governmental proceedings. It reads:

No person shall discharge or in any way discriminate or cause to be discharged or discriminated against any miner or any authorized representative of miners by reason of the fact that such miner or representative (A) has notified the Secretary or his authorized representative of any alleged violation or danger, (B) has filed, instituted, or caused to be filed or instituted any proceeding under this chapter, or (C) has testified or is about to testify in any proceeding resulting from the administration or enforcement of the provisions of this chapter.

30 U.S.C. § 820(b)(1) (*cited in id.* at 777 n. 17).

6. Significantly, in reaching this holding, the court pointed out that:

The parallels between the Mine Safety Act and other protective labor acts are signifi-

cant. The Safety Act provision which we here construe was introduced with the announced intention of giving to miners 'the same protection against retaliation which we give employees under other Federal labor laws.' Specifically, the ... Fair Labor Standards Act....

*Id.* at 782 (*quoting* 115 Cong.Rec. 27948 (1969)).

7. The relevant section of that Act read:

A common carrier by railroad ... may not discharge or in any manner discriminate against any employee because such employee ... (1) filed any complaint or instituted or caused to be instituted any proceeding under or related to the enforcement of the Federal railroad safety law; or (2) testified or is about to testify in any such proceeding.

45 U.S.C. § 441(a).

8. The language of the statute was, again, more limited than that of the FLSA. Section 507(a) of the Clean Water Act provides:

No person shall fire, or in any other way discriminate against ... any employee ... by reason of the fact that such employee ... has filed, instituted, or caused to be filed or instituted any proceeding under this chapter, or has testified or is about to testify in any proceeding resulting from the administration or enforcement of the [Clean Water Act].

Third Circuit wrote with respect to the Clean Water Act's provision:

> The whistle-blower provision was enacted for the broad remedial purpose of shielding employees from retaliatory actions taken against them by management to discourage or to punish employee efforts to bring the corporation into compliance.... If the regulatory scheme is to effectuate its substantive goals, employees must be free from threats to their job security in retaliation for their good faith assertions of corporate violations of the statute. *Section 507(a)'s protection would be largely hollow if it were restricted to the point of filing a formal complaint with the appropriate external law enforcement agency.* Employees should not be discouraged from the normal route of pursuing internal remedies before going public with their good faith allegations.

*Id.* at 478 (emphasis added).[9]

As the above discussion demonstrates, federal courts have consistently construed anti-retaliation provisions analogous to the FLSA's as extending protection to complaints made by employees to their employers. By holding that the anti-retaliation provision of the FLSA similarly extends protection to employees who complain of alleged violations to their employers, we follow a course well tread both by our court and the other circuits.[10]

▮ Of course, in order to find protection under § 215(a)(3), an employee must actually communicate a complaint to the employer. In *Valerio*, after holding that § 215(a)(3) extends to complaints filed with an employer, the First Circuit went on to state that "not all abstract grumblings will suffice to constitute the filing of a complaint with one's employer," and that " '[t]here is a point at which an employee's concerns and comments are too generalized and informal to constitute 'complaints' that are 'filed' with an employer within the meaning of the [statute].' " 173 F.3d 35 at 44 (*quoting Clean Harbors,* 146 F.3d at 22). We agree that not all amorphous expressions of discontent related to wages and hours constitute complaints filed within the meaning of § 215(a)(3). The actions taken by the plaintiffs here, however, were in no way amorphous and, given our holding today, clearly constitute the filing of a complaint within the meaning of the statute. Again, the plaintiffs not only complained orally to their employers about the failure to pay adequate overtime wages, and specifically alleged a violation of the FLSA, they also contacted the Department of Labor (which informed them that their employer's practices were illegal), hired an attorney to assist them with their claim, and notified their employer in writing of the specific FLSA violation they were alleging.

▮ While these actions unquestionably amount to the filing of a complaint within the meaning of § 215(a)(3), less formal and detailed communications also fit the statutory definition. Although we need not, and indeed could not, describe

---

33 U.S.C. § 1367(a).

**9.** The list goes on. *See, e.g., Clean Harbors Envtl. Servs., Inc. v. Herman,* 146 F.3d 12 (1st Cir.1998) (construing analogous anti-retaliation provision of the Surface Transportation Assistance Act to include internal employee complaints); *Bechtel Constr. Co. v. Secretary of Labor,* 50 F.3d 926, 931–33 (11th Cir.1995) (construing the Energy Reorganization Act anti-retaliation provision as extending to internal employee complaints); *Kansas Gas & Elec. Co. v. Brock,* 780 F.2d 1505, 1510–12 (10th Cir.1985) (same).

**10.** We reject the defendants' argument that the cases we have cited are inapposite be-

cause they involve health or safety while the present case involves economic rights. First, the defendants' contention misses the central point that the anti-retaliation provisions of all these statutes have analogous purposes. As the D.C. Circuit noted in *Phillips,* the safety statutes at issue were designed to give employees "the same protection against retaliation" as afforded by the FLSA. 500 F.2d at 782. Second, we disagree that clean water, for example, *see, e.g., Passaic Valley,* 992 F.2d at 478, is necessarily a more important or more pressing objective than ensuring that workers receive the minimum wages which the law guarantees them. Certainly, Congress has made no such determination.

the minimum specificity with which an employee must assert an alleged FLSA violation in order to find protection under § 215(a)(3)—and we agree with the First Circuit that such questions are to be resolved as a matter of factual analysis on a case-by-case basis—it is clear that so long as an employee communicates the *substance* of his allegations to the employer (e.g., that the employer has failed to pay adequate overtime, or has failed to pay the minimum wage), he is protected by § 215(a)(3). As several circuits have held, moreover, the employee may communicate such allegations orally or in writing, and need not refer to the statute by name. *See, e.g., Romeo Community Schs.,* 976 F.2d at 989 (employee who communicated substance of allegations to employer and stated that she believed the employer was "breaking some sort of law," is protected by § 215(a)(3)).

In short, § 215(a)(3) protects from retaliation employees who complain to their employer about alleged violations of the Act. Accordingly, the plaintiffs here engaged in protected conduct and stated a valid claim under the FLSA.

## III.

### Remaining Claims

A. Liability Instruction

█ Having resolved the central issue raised by this appeal, we now address the defendants' remaining claims. The defendants first argue that the district court erred in instructing the jury on mixed-motives liability under the FLSA. At trial, the defendants argued that the plaintiffs were discharged not because they complained about overtime violations, but because the Sonics, on account of purely economic considerations, needed to "restructure" their ticket sales operations. The jury was instructed that in order to prevail on their retaliation claim, the plaintiffs had to show:

1. That the defendant was aware of one or more plaintiffs' participation in protected activity;
2. That an adverse employment action was taken against the plaintiffs; and
3. That the protected activity was a substantial motivating factor in the adverse employment action as to that plaintiff.

(SER 20). Relying on *Knickerbocker v. City of Stockton,* 81 F.3d 907, 911 (9th Cir.1996), the defendants contend that the district court erred by failing to give an affirmative defense instruction; namely, that the defendants could escape liability by proving that "the plaintiffs would have been discharged regardless of any protected activity." (Opening Brief at 27). We need not decide whether the district court erred, however, because we conclude that any error was "more probably than not harmless." *See, e.g., Mockler v. Multnomah County,* 140 F.3d 808, 812 (9th Cir. 1998).

█ As we have explained on numerous occasions, an error in instructing the jury in a civil case does not require reversal if the error was "more probably than not harmless." *Coursen v. A.H. Robins Co.,* 764 F.2d 1329, 1337 (9th Cir.1985).[11] In *Benigni v. City of Hemet,* 879 F.2d 473, 480 (9th Cir.1988), we held that the district court's failure to give an instruction requested by the defendant was harmless because "the evidence would have supported a verdict for the plaintiff even with th[e requested] instruction." The same is true here.

The evidence clearly supports the conclusion that the defendants would *not* have discharged the plaintiffs in the absence of the protected conduct. First, the jury heard testimony that Brian Dixon, the Sonics Controller and the person in charge of finance for the organization, had told Lambert that she would "definitely not have a job" and would "be fired" if she continued to press for her rights under the FLSA. (SER 195–96).[12] Such direct evi-

---

11. The harmless error standard applied in civil cases is far "less stringent" than that applied in criminal cases. *Mockler,* 140 F.3d at 813.

12. The district court admitted Lambert's testimony regarding Dixon's statements after re-

dence, rare as it may be in mixed-motives cases, strongly supports the determination that the Sonics fired the plaintiffs because of their protected conduct, and that they would not have done so in the absence of the overtime complaints. Second, the jury had before it evidence that the entire sales group was fired *except for the one agent who did not complain about the overtime violations.*[13] This evidence makes it wholly implausible that the discharges were the result of a "restructuring" driven by economic considerations. Third, the jury had before it evidence that immediately after the discharge of the entire sales staff (except Novak), the Sonics announced new job openings for Ticket Sales Account Executives with job descriptions identical to those previously held by the plaintiffs. (SER 161). Had the discharges actually been based on an economic need to "restructure" ticket sales operations, it is unclear why these plaintiffs would have been discharged and replaced in identical jobs by other sales agents. The alacrity with which the new job postings were listed suggests strongly that the motivation behind the discharges was retaliation and not a need for economic restructuring.

In short, the evidence before the jury strongly supports the conclusion that the plaintiffs were discharged in retaliation for their overtime complaints and that they would *not* have been discharged had they not engaged in this protected conduct. Under these circumstances, any instructional error was more probably than not harmless. *See Benigni,* 879 F.2d at 480.

█ There is another reason why we conclude that the failure to give the instruction requested by the defendants was at most harmless error—that is, the jury's decision to award $12 million in punitive damages. In several cases we have held

an instructional error regarding liability to be harmless in light of a punitive damages award. *See, e.g., Larez v. Holcomb,* 16 F.3d 1513, 1518 (9th Cir.1994); *see also Benigni,* 879 F.2d at 480. In *Larez,* for example, the plaintiff brought a § 1983 action alleging that she had been arrested and held without probable cause. After the jury returned a verdict for the plaintiff, the defendant appealed and argued that the court had erred in instructing the jury as to the burden of proving that Larez had voluntarily consented to the detention. Although we concluded that the court's instruction was erroneous, we held that the error was harmless in light of the jury's award of punitive damages. As we explained:

> [I]t is highly significant that, in this case, the jury not only found Holcomb liable, but also assessed a punitive award against him. In order to award any punitive damages, the jury had to find that Holcomb had engaged in 'extraordinary misconduct.' The court's instruction on this point was unambiguous. The jury's implicit finding of extraordinary misconduct provides a strong indication that the jury did not find Holcomb's account [of the events underlying the plaintiff's allegations] persuasive.

*Id.* at 1518.

As in *Larez,* the court's punitive damages instruction here was unambiguous. In order to award punitive damages, the jury had to find that "the defendants' conduct was malicious, or in reckless disregard of plaintiffs' rights." (SER 33). The court explained that "in this context, conduct is malicious if it is accompanied by ill will, or spite, or if it is for the purpose of injuring another. Conduct is in reckless disregard of a party's rights if, under the

jecting an objection raised in an in limine motion. The court did not abuse its discretion in admitting the evidence as Dixon was an agent of the defendants at the time he made the statements. *See* Fed.R.Evid. 801(d)(2)(D); *see also Hoptowit v. Ray,* 682 F.2d 1237, 1262 (9th Cir.1982).

13. The record makes clear that the only member of the sales staff not fired was Randy Novak. Plaintiff Letitia Selk testified that Novak had never complained about the overtime violations, and had never associated himself with the group of sales agents who had expressed concern over these violations. (SER 271–72).

circumstances, it reflects complete indifference to the rights of others." (SER 33). The jury's award of $12 million in punitive damages reflects its determination that, in discharging the plaintiffs, the defendants acted maliciously, or in reckless disregard of the plaintiffs' rights; that the discharge was for the purpose of injuring the plaintiffs, or that it reflected a complete indifference to the plaintiffs' rights. Given this determination, it is, at the least, more likely than not that the jury did not believe the defendants' explanation for the discharges. That is, given the award of punitive damages, it is more likely than not that the jury simply did not believe that the discharges were driven, in whole or in part, by economic restructuring. In fact, the punitive damages award makes it quite plain that the jury concluded that the defendants would not have discharged the plaintiffs in the absence of protected conduct. Accordingly, for this reason also, the district court's failure to instruct the jury that the defendants could escape liability by proving that they "would have taken the adverse action if the proper reason alone had existed," *Knickerbocker*, 81 F.3d at 911, was at most harmless error. *See Mockler*, 140 F.3d at 812.

B. Liability as to the other plaintiffs

 The defendants next argue that even if Lambert's actions were protected by § 215(a)(3), there was no evidence that the remaining plaintiffs complained about overtime violations. Accordingly, the defendants argue, there is no evidentiary support for the jury's verdict that these plaintiffs were discharged in retaliation for protected activity. In denying the defendants' motion for judgment as a matter of law on this ground, the district court concluded that the plaintiffs had complained about the overtime violations as a group and that Lambert had acted in a representative capacity when she filed her complaints with the employer. We agree with

the district court that Lambert complained on behalf of the named plaintiffs and that sufficient evidence was therefore presented to support a retaliation claim with respect to all the plaintiffs.[14]

Perhaps most important, the original letter sent to the Sonics by Lambert's attorney referred both to Lambert's overtime complaints and to those of her coworkers. For instance, the letter stated that "when Ms. Lambert *and other employees* have inquired about overtime compensation, managers have told them that overtime compensation is not required." (SER 117). The letter went on to explain that "[t]he Department [of Labor] told Ms. Lambert that she *and other employees* are entitled to one and one-half times their regular rate of pay for each hour over forty worked in a week." (SER 117). The letter concluded with this request: "[W]e ask that you instruct your managers to refrain from retaliation or threats of retaliation against Ms. Lambert *and other employees*." (SER 118). In short, Lambert's complaints were lodged not only on her own behalf, but on behalf of the rest of the ticket sales staff, including all of the plaintiffs here. The defendants had direct and specific notice that Lambert and her coworkers were making demands for overtime compensation in accordance with the FLSA.

The testimony of both plaintiff and defense witnesses supports this conclusion. At trial, Lambert testified she and plaintiff Chuck Viltz acted as representatives of the group of sales agents. She stated that "[t]he sales staff as a whole decided to have two members of the sales staff go and talk to the director of sales and the vice-president of sales and sponsorship, and Chuck Viltz and I were picked to do that." (SER 202). The defendants confirmed Lambert's account. For example, Bob Boustead, the Sonics head of ticket sales, testified that "Chuck [Viltz] and Laura [Lambert] were the spokespersons for the

---

14. We note that the three-judge panel that initially heard this case also concluded that Lambert had acted in a representative capacity when she filed her overtime complaints with the employer. *See Lambert v. Ackerly,* 156 F.3d 1018, 1024 (9th Cir.1998), *reh'g en banc granted and opinion withdrawn,* 169 F.3d 666 (9th Cir.1999).

sales folks." (SER 265). Dresel, the Sonics Vice President, testified that it was difficult for him to distinguish amongst the plaintiffs because "the whole group is now lumped together." (ER 264). Finally, in his opening statement to the jury, the defendants' counsel referred to Lambert as the plaintiffs' "ringleader." (SER 163). As the evidence supports the conclusion that Lambert was acting on behalf of the plaintiffs as a group, the jury's verdict on behalf of each plaintiff is sound.

### C. Damages

The defendants also object to two parts of the damages award. They first contend that punitive damages are not available under the FLSA.[15] The only circuit to address this question has concluded that punitive damages are available under the Act. *See Travis v. Gary Comm. Mental Health Ctr., Inc.*, 921 F.2d 108, 112 (7th Cir.1990). Although the Seventh Circuit's reasoning is persuasive, we do not reach the question because the defendants have waived the issue of the availability of punitive damages by failing to raise it below. Indeed, the defendants *proposed* the punitive damages instruction that was ultimately delivered by the district court, and never objected to the instruction after they proposed it. Although the defendants contended that no punitive damages instruction was "necessary," and although their trial brief stated that punitive damages "should not be allowed," the district court reasonably construed these statements as arguments that these particular plaintiffs had not made out a sufficient case of malice and/or recklessness to warrant an award of punitive damages. (ER 79–80). We agree with the district court, and conclude that the defendants failed to raise any objection that punitive damages are not available under the FLSA. We therefore treat the argument as waived.

The defendants next contend that the award of damages for emotional distress was excessive, and that the award was the product of passion and prejudice. We may reverse a jury's finding of the amount of damages if the amount is grossly excessive or monstrous, *see, e.g., Los Angeles Mem'l Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1360 (9th Cir.1986). The jury awarded each plaintiff $75,000 in emotional distress damages. Each plaintiff testified to the emotional toll that the illegal discharge had taken on his or her life. Given the evidence that was before the jury, we cannot conclude that the award of emotional distress damages was either grossly excessive or monstrous. *Los Angeles Mem'l Coliseum*, 791 F.2d at 1360.

The defendants' argument that the award was based on passion or prejudice depends entirely on the fact that each plaintiff was awarded the same amount of emotional distress damages. A review of the evidence, however, demonstrates that the emotional distress suffered by each plaintiff was, in fact, quite similar. We agree with the district court, moreover, that the jury likely concluded that the emotional harm to each plaintiff was roughly equal given the similar treatment each plaintiff suffered at the hands of the defendants. (ER 94). Accordingly, we also reject the defendants' argument that the emotional distress award was the result of passion or prejudice.

### D. Individual Defendants

The defendants' final contention concerns the individual defendants William and Barry Ackerley. Their first argument is that the Ackerleys cannot be liable for the discharges because they are not "employers" within the meaning of the FLSA.[16] We have held that the definition

---

15. The defendants also argue that the award of punitive damages was excessive. The district court remitted a $12 million award to just over $4 million. In light of the conduct engaged in by the defendants and in light of the defendants' substantial financial assets, the $4 million award that the plaintiffs ulti-

mately accepted was not, by any means, excessive.

16. Although their arguments are not altogether clear, the defendants appear to object to the jury instruction on this point, and to allege that there was insufficient evidence to

1012

of "employer" under the FLSA is not limited by the common law concept of "employer," but "is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes." *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir.1983). Where an individual exercises "control over the nature and structure of the employment relationship," or "economic control" over the relationship, that individual is an employer within the meaning of the Act, and is subject to liability. *Id.* at 1470. The district court instructed the jury that it could find the individual Ackerleys liable only if it determined that they had a "significant ownership interest with operational control of significant aspects of the corporation's day-to-day functions; the power to hire and fire employees; [the power to] determin[e][ ]salaries; [the responsibility to] maintain[ ] employment records." (SER 25). This instruction is entirely consistent with our interpretation of "employer" under the FLSA, and was in no way erroneous. *See Bonnette*, 704 F.2d at 1468–70. The evidence, moreover, strongly supports the jury's determination that both Ackerleys exercised economic and operational control over the employment relationship with the sales agents, and were accordingly employers within the meaning of the Act.

 The defendants also argue there was insufficient evidence to support an award of punitive damages against these individual defendants. We cannot disturb the jury's verdict if it is supported by substantial evidence. *See, e.g., Murray v. Laborers Union Local 324*, 55 F.3d 1445, 1452 (9th Cir.1995). Substantial evidence is "such reasonable evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir.1987). The record makes clear that the jury's award of punitive damages against the Ackerleys was supported by

support a finding that the Ackerleys were

substantial evidence. The jury heard testimony that the Ackerleys had a long-standing policy of refusing to pay overtime as required by federal law. (SER 279–80). Indeed, the jury was informed that the Ackerleys had been the subject of a previous federal lawsuit for overtime violations. (ER 86). The jury also heard extensive testimony that both Ackerleys were aware of and participated in the overtime dispute with the plaintiffs here, and were involved in the decision to terminate the sales staff. For example, the letter from Lambert's attorney was hand-delivered to Barry Ackerley's office, and Dresel's notes from a June 22nd meeting at which the overtime complaints were discussed stated that "Barry [was] being told." (ER 121). Finally, the jury heard testimony that William Ackerley had told his chief financial officer that he "doesn't care what the laws are," that he believed "the law was not made for [his] business," and that he would not pay overtime but would "wait until someone sues [him]." (SER 194). Such evidence reasonably supports the jury's determination that the Ackerleys acted with reckless disregard for the plaintiffs' rights. There was, accordingly, sufficient evidence to support the award of punitive damages against the individual defendants.

## IV.

### Attorneys Fees

██ Following trial, the district court awarded the plaintiffs $389,117.50 in attorneys fees. Following the resolution of the post-trial motions, the plaintiffs applied for $141,080 in supplemental fees, and the district court awarded them $44,075. The plaintiffs cross-appeal the district court's supplemental award, claiming that the court abused its discretion by failing to award them the full $141,080 requested. Parties are entitled to fees only for work related to issues on which they prevail, and here the plaintiffs failed to prevail on an

employers within the meaning of the Act.

extremely important post-trial issue—the remittitur with respect to punitive damages. The district court's fee awards were all carefully considered, and the court did not abuse its discretion by awarding the plaintiffs only $44,075 in supplemental fees. We therefore affirm the fee awards.

## V.

### Conclusion

The plaintiffs were discharged in retaliation for activity protected by the Fair Labor Standards Act. Accordingly, the judgment of the district court is affirmed in all respects. Interest shall be awarded from the date of final judgment.

**AFFIRMED.**

RYMER, Circuit Judge, with whom FERNANDEZ, Circuit Judge, joins, dissenting in part and concurring in the judgment in part:

While the majority's view that 29 U.S.C. § 215(a)(3) protects employees who complain to an employer about overtime may well modernize the FLSA, I believe this is for Congress-not the courts-to do. And I continue to agree with the panel opinion, and the Second Circuit, that this interpretation is an option the plain language of § 215(a)(3) makes unavailable. Section 215(a)(3) says that it is unlawful to discharge an employee because he or she "has filed any complaint." It does not say "has complained to the employer" or "has made any complaint to the employer." [1]

Washington law *does* say that. *It* prohibits an employer from discharging an employee who "has made any complaint to

1. Nor does it matter whether or not Congress meant to include grievances "filed" with the employer, as the majority suggests, for no such thing happened in this case. More importantly, the jury was instructed (and so could have returned its verdict based on finding) that complaining to an employer *or* requesting information from the government suffices.

2. *See infra* note 6 for full statutory text.

3. *See* Lewis Carroll, Through the Looking Glass. As Humpty Dumpty responded to Al-

his employer." Wash. Rev.Code § 49.46.100(2).[2]

If the federal statute and the state statute mean the same thing, as the court has now held, then words mean anything we say they do.[3] I therefore dissent for the reasons set forth in Parts II, III and IV of the panel opinion, authored by Judge Brunetti, which I adopt:[4]

### II. Liability

The plaintiffs alleged that they were retaliated against in violation of both the federal FLSA and the public policy of the state of Washington. We [would] now hold that the plaintiffs failed to state a valid claim under federal law, but were properly allowed to proceed with their claims under Washington law.

### A. Retaliation for Informal Complaints Is Not Covered Under the FLSA

The FLSA's anti-retaliation provision makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." 29 U.S.C. § 215(a)(3). Defendants urge us to strictly construe this provision, so as to exclude the present plaintiffs' informal complaints from its coverage.

"As in all cases of statutory interpretation, our starting point in determining

ice's question "whether you *can* make words mean so many different things," "The question is . . . which is to be master-that's all."

4. Judge Kleinfeld and I joined the opinion, Parts II, III and IV of which I reproduce in full here because the opinion was automatically withdrawn pursuant to our rules when the court voted to rehear the case en banc. I concur in the judgment to the extent that it affirms on liability and wages, but I would do so only under Washington law.

Congress's intent must be the language of the statute itself." *Fernandez v. Brock,* 840 F.2d 622, 632 (9th Cir.1988); *Dunn v. CFTC,* 519 U.S. 465, 117 S.Ct. 913, 916, 137 L.Ed.2d 93 (1997) ("[A]bsent any 'indication that doing so would frustrate Congress's clear intention or yield patent absurdity, our obligation is to apply the statute as Congress wrote it'"); *see also West Virginia University Hospitals, Inc. v. Casey,* 499 U.S. 83, 100–01, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991); *Union Bank v. Wolas,* 502 U.S. 151, 158, 162, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991).

At trial, the district court instructed the jury that "[a]n employee has participated in protected activity if the employee has either complained to superiors regarding any issues related to the Fair Labor Standards Act or requested information from the government about minimum wages or overtime compensation." We [would] hold that this instruction was incorrect under federal law.

The question of whether § 215(a)(3) covers informal complaints has never before been addressed by this court. *See Knickerbocker v. City of Stockton,* 81 F.3d 907, 912 n. 3 (9th Cir.1996) (declining to decide whether internal complaints are protected conduct under the FLSA). However, this issue was recently considered by the Second Circuit, which held that "[t]he plain language of [section 215(a)(3)] limits the cause of action to retaliation for filing formal complaints, instituting a proceeding, or testifying, but does not encompass complaints made to a supervisor." *See Lambert v. Genesee Hospital,* 10 F.3d 46, 50, 55 (2d Cir.1993), *cert. denied,* 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994). Because we agree with the *Genesee* court that the language of the FLSA's anti-retaliation provision is plain and unambiguous, we [would] now adopt the Second Circuit's analysis.

In *Genesee,* certain female employees alleged that they were retaliated against in violation of the Equal Pay Act (EPA).[5] Specifically, the female employees claimed that the promotion of a male employee to manager was in retaliation for the female employees' complaints to their supervisors about the denial of equal pay and for other complaints of discrimination. *Id.* at 51. Because the *Genesee* plaintiffs' retaliation claims all arose out of informal, oral complaints to a supervisor, the Second Circuit held that the plaintiffs failed to state a cause of action under § 215(a)(3). *Genesee,* 10 F.3d at 54–56.

In reaching this conclusion, the court contrasted Title VII's broad anti-retaliation provision with the FLSA's narrower coverage. Under Title VII, it is an unlawful employment practice for an employer to discriminate against an employee "because he has *opposed any practice* made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a) (emphasis added). The "opposition" language in Title VII's anti-retaliation provision clearly encompasses an employee's complaint to supervisors, regardless of whether the employee also files a formal charge with the Equal Employment Opportunity Commission. *Genesee,* 10 F.3d at 55 (citation omitted). No such broad language is found in the FLSA's anti-retaliation provision.

The Second Circuit also distinguished its earlier case of *Brock v. Casey Truck Sales, Inc.,* 839 F.2d 872 (2d Cir.1988). In *Casey,* a DOL investigator, acting on a worker's overtime complaint, found that the employer had not properly paid overtime and had falsified its records in an attempt to hide its wrongdoing. *Id.* at 874–75. After the employer eventual-

---

**5.** The EPA is an amendment to the FLSA and is codified under the same chapter. Therefore, retaliation for filing EPA complaints, like retaliation for filing overtime complaints, is analyzed under § 215(a)(3). *See Genesee,* 10 F.3d at 55.

ly admitted the violations and agreed to pay overtime wages, the employer nonetheless asked the employees to return the back overtime wages. Those who refused were fired. Noting the connection between the earlier formal proceedings and the retaliatory conduct, the court stated that the protection against retaliation under the FLSA "would be worthless if an employee could be fired for declining to give up the benefits he is due under the Act." *Id.* at 879. Thus, it was clear in *Casey* that there had been a formal complaint made to the DOL by an employee, a formal investigation, and a finding of overtime violations.

Similarly, in *Brennan v. Maxey's Yamaha, Inc.*, 513 F.2d 179 (8th Cir. 1975), a company was ordered to pay back wages after a DOL investigation disclosed minimum wage and maximum hour violations. The company later insisted that employees endorse back the back wage checks. An employee protested this as unlawful conduct on the company's part and was fired. The court held that the employee's protest was an act protected from reprisals, finding that "[h]er discharge was a direct result of her insistence upon receiving retroactive benefits required under the Act." *Id.* at 181.

In contrast, in *Genesee*, the acts for which the employer allegedly retaliated did not in any way grow out of the formal filing of a complaint. *Genesee*, 10 F.3d at 55–56. Rather, there were "simply oral complaints to a supervisor that an employee was being paid less than the complainants thought she should have been." *Id.* at 56.

The present case is much more closely analogous to *Genesee* than to *Casey*. Here, neither Lambert nor any of the other plaintiffs actually "filed" a formal complaint or instituted or testified in an FLSA proceeding. Rather, Lambert merely complained about overtime to her supervisor and to other Full House employees; called the DOL for information, and informed her superiors that she had done so; had her lawyers send a letter to Barry Ackerly regarding the overtime issue; and had a complaint delivered to the Sonics. Because such conduct is not encompassed by the plain and unambiguous language of § 215(a)(3), the plaintiffs have failed to state a retaliation claim under the FLSA.

We recognize that several other circuits have come to the conclusion that informal complaints and requests for information from the DOL do constitute protected activities under § 215(a)(3). *See E.E.O.C. v. Romeo Community Schools*, 976 F.2d 985, 989 (6th Cir.1992) (holding that complaining to a school district of unlawful sex discrimination and expressing the belief that the law is being broken are sufficient to state a retaliation claim); *E.E.O.C. v. White & Son Enterprises*, 881 F.2d 1006, 1011 (11th Cir.1989) (holding that unofficial complaints to an employer about unequal pay constitute an assertion of rights protected under the statute); *Brock v. Richardson*, 812 F.2d 121, 124–25 (3d Cir.1987) (holding that retaliation based on employer's mere belief that an employee filed a formal complaint is sufficient to bring employer's conduct under the FLSA); *Love v. RE/MAX of America, Inc.*, 738 F.2d 383, 387 (10th Cir.1984) (holding that it is the assertion of statutory rights, not the filing of a formal complaint, which triggers a retaliation claim); *Crowley v. Pace Suburban Bus Div.*, 938 F.2d 797, 798 (7th Cir. 1991) (broadly construing the statute to protect against retaliation for an employee's assertion of rights under the FLSA); *Brennan*, 513 F.2d at 181. These circuits have reached this conclusion by extending the language of § 215(a)(3) beyond its plain meaning so as to "effectuate the broad remedial purposes of the FLSA." We [should], however, reject this approach in light of the clear language of the statute.

### B. Washington Law Covers Informal Overtime Complaints

Regardless of their failure to state a valid retaliation claim under federal law, the plaintiffs have asserted in their complaint state law claims for violation of public policy. Washington law prohibits retaliation against an employee who "has made *any* complaint to [her] employer" or who "has caused to be instituted or is *about to* cause to be instituted any proceeding under or related to the [Washington wage and overtime laws]." Wash. Rev.Code § 49.46.100(2) (emphasis added).[6] Since there is no dispute that Lambert complained to her superiors about the lack of overtime pay, and threatened on several occasions to file suit, Lambert has stated a valid retaliation claim under Washington law.

### C. All of the Plaintiffs Have Stated a Valid Cause of Action Under Washington Law

Defendants argue that because all of the plaintiffs other than Lambert predicate their retaliation claims on Lambert's overtime complaints, they are covered by neither § 215(a)(3) nor Washington law, both of which impose liability for the discharge of "such employee" as engaged in protected conduct.

According to defendants, if the court is to give the words "such employee" any meaning, those words must be held to confine liability to the discharge of the employee who herself was engaged in the protected conduct. We [would] hold, however, that sufficient evidence was presented in this case to support a retaliation claim on behalf of all of the plaintiffs. The AEs have clearly shown that they complained as a group about overtime violations, and that Lambert pursued her claim for the benefit of the entire group. For instance, in their original letter to the Sonics, Lambert's attorneys referenced both Lambert's overtime complaints and those of the other employees. Thus, the defendants were on notice, specifically and directly, that Lambert and the other employees were making demands for overtime compensation. Moreover, Lambert, as well as Sonics officials, testified at trial that Lambert and Viltz were acting as spokespersons for the whole group of AEs in negotiations over their compensation.

Because the evidence supports a finding that Lambert and Viltz were acting as representatives for the AEs in complaining about overtime compensation, all of the present plaintiffs were entitled to protection against retaliation under Washington law.

This case was tried under federal law with the assumption that Washington law also governed the plaintiffs' claims. Because the district court only considered the plaintiffs' claims under the FLSA when considering defendants' motion for judgment as a matter of law, we [would] now remand to the trial court to reconsider the defendants' motion for judgment as a matter of law by reassessing the jury's finding of liability, taking into account only Washington law. Specifically, the district court must decide under Washington law whether the plaintiffs met their burden of proof as to causation and retaliatory intent, and whether or not the Ackerlys can be considered "employers" subject to personal liability.

6. Wash. Rev.Code § 49.46.100(2) provides in full that
Any employer who discharges or in any manner discriminates against any employee because such employee has made any complaint to his employer, to the director, or his authorized representative that he has not been paid wages in accordance with the provisions of this chapter, or that the employer has violated any provision of this chapter, or because such employee has caused to be instituted or is about to cause to be instituted any proceeding under or related to this chapter, or because such employee has testified or is about to testify in any such proceeding shall be deemed in violation of this chapter and shall, upon conviction therefor, be guilty of a gross misdemeanor.

## III. Damages

In light of the failure of plaintiffs' retaliation claims under § 215(a)(3), the parties' arguments as to the availability of punitive damages under the FLSA are moot.

There is no dispute that Washington law does not allow for punitive damages in wrongful termination cases, *see Dailey v. North Coast Life Ins. Co.*, 129 Wash.2d 572, 919 P.2d 589 (1996); therefore, the punitive damages award [should be] reversed.

Turning to the emotional distress damages, each plaintiff was awarded $75,000 by the jury for emotional distress. Defendants argue that this must have been the product of speculation because the different plaintiffs manifested different symptoms, some physical and some purely mental, and none of the plaintiffs provided any corroborating evidence. *See Brady v. Gebbie*, 859 F.2d 1543, 1558 (9th Cir.1988), *cert. denied*, 489 U.S. 1100, 109 S.Ct. 1577, 103 L.Ed.2d 943 (1989) (plaintiff presented psychiatric testimony of emotional distress and permanent psychological damage). Plaintiffs respond that the defendants mistreated all of the AEs in the same way, thereby justifying identical awards. The district court agreed with the plaintiffs, finding that "the jury must have concluded that the emotional harm to each plaintiff was roughly equal given their similar treatment by defendants."

A reviewing court must uphold the jury's finding of the amount of damages unless the amount is " 'grossly excessive or monstrous,' clearly not supported by the evidence, or 'only based on speculation or guesswork.' " *Los Angeles Memorial Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1360 (9th Cir.1986) (citations omitted).

We agree with defendants that $75,000 for emotional distress is grossly excessive given that the symptoms manifested by the plaintiffs were not particularly severe. *See Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1230 (7th Cir.1995) (finding unreasonable a $21,000 award for emo-

tional distress in an FLSA retaliation case); *see also Hetzel v. County of Prince William*, 89 F.3d 169, 171 (4th Cir.1996), *cert. denied*, 519 U.S. 1028, 117 S.Ct. 584, 136 L.Ed.2d 514 (reversing a $500,000 award for emotional distress arising out of retaliation in violation of the First Amendment). Moreover, that plaintiffs were all awarded the same amount, despite the fact that their distress levels varied widely, suggests that the awards were the product of guesswork.

We therefore [would] reverse with respect to the emotional distress damages and remand for determination of a reasonable amount should the district court find the defendants liable on remand.

## IV. Attorneys' Fees

Because the district court [should] be required on remand to redetermine the appropriate attorneys' fee awards in light of its decision as to liability, we express no opinion at this time on the attorneys' fee issues raised by the parties.