**In re Loyd Richard TINKER & Geraldine Viola Tinker, Debtors.**

**Loyd Richard TINKER & Geraldine Viola Tinker, Plaintiffs,**

v.

**STURGEON STATE BANK, Defendant.**

**Bankruptcy No. 88–01882–C.
Adv. No. 88–0591–C.**

United States Bankruptcy Court, W.D. Missouri, C.D.

May 18, 1989.

**958**

Norman W. Lampton, Columbia, Mo., for plaintiff.

Elton W. Fay, Columbia, Mo., for defendant.

Fred Dannov, Columbia, Mo., for debtors.

J. Michael Gillaspie, Kansas City, Mo., for F.D.I.C.

Jack E. Brown, Columbia, Mo., Trustee.

## MEMORANDUM OPINION

FRANK W. KOGER, Bankruptcy Judge.

Loyd Richard Tinker and Geraldine Viola Tinker filed under Chapter 7 on April 25, 1988. Geraldine Viola Tinker was and had been an employee of Sturgeon State Bank for over fifteen years. Sturgeon State Bank was one of two principal creditors of the Tinkers and held security interests in the Tinkers' real estate, livestock and equipment. The Tinkers sold $27,697.20 of livestock on March 30, 1989, through an auction house in Columbia, Missouri. The check therefor was issued on March 31, 1989, to the Tinkers only, and they turned same over to Mr. Fred Dannov, their bankruptcy counsel. Mr. Dannov shares office space with Mr. Elton Fay, counsel for the Sturgeon State Bank, but there is no partnership or association between counsel. On or about April 10, 1988, Sturgeon State Bank learned of the sale. On or about April 20, 1988, Sturgeon State Bank terminated Geraldine Viola Tinker's employment. On or about August 15, 1988, this adversary action was filed under 11 U.S.C. § 525(b).

Discovery took considerable time, primarily because of the desires of the Tinkers to obtain information from the F.D.I.C. which had been conducting an audit of Sturgeon State Bank during early April. Fortunately, through the good offices of J. Michael Gillaspie counsel for the F.D.I.C., a compromise was established that provided limited access to said material and that point is not in issue as far as the Court knows.

Trial was had on April 13, 1989. The parties have filed their briefs, and this opinion follows. For the purpose of the opinion, Geraldine Viola Tinker will be referred to as plaintiff; Loyd Richard Tinker will be referred to as debtor; the term debtors will denominate both Tinkers; and Sturgeon State Bank will be referred to as Bank.

Like so much of the Bankruptcy Reform Act of 1978, 11 U.S.C. § 525 was a compromise between advocates of the "born again debtor faction" which proposed that past bankruptcy could not be considered by anyone for any purpose, including prospective credit granters, in evaluating the past as prologue to the future. The opponents who might be characterized as "each dog gets only one bite faction" would have preferred the status quo of the old Bankruptcy Act wherein prior bankruptcy was as much a part of a person's credit history as any other factor bearing on the likelihood that they would fulfill their future obligations. The compromise worked out as part of the "fresh start" concept provided:

> "That a governmental unit (except under the Perishable Agricultural Commodities Act, the Packers and Stockyards Act, or Section 1 of 57 Stat. 422; 7 U.S.C. 204) could not in any way use bankruptcy or insolvency before bankruptcy as a basis for its treatment of any person."

Said mandate is broadened appreciably by the definitions of "governmental unit" in 11 U.S.C. Section 101(26) and "person" in 11 U.S.C. Section 101(35).

Then in 1984, Congress amended 11 U.S.C. § 525 to add:

> That a private employer could not terminate employment or discriminate with respect to employment of any individual solely because of the bankruptcy or prefiling insolvency of an individual, or even the failure to pay a debt dischargeable or discharged under the Bankruptcy Act.

Most of the cases reported to date have involved the first section paraphrased above (11 U.S.C. § 525(a)) and so cases under the second section paraphrased above (11 U.S.C. § 525(b)) provide less guidance as to application, there being no circuit and only two district court cases

reported as on point since the 1984 amendment.

At trial the evidence presented established that plaintiff had been an employee of the Bank for 15 years. Plaintiff had started as a proof operator, then became a teller, and then became a loan secretary. Her last employee evaluation was dated March 16, 1988. The Bank used a scale of 1 (Excellent) to 5 (Unsatisfactory) and plaintiff averaged 2.73 or slightly above the category average and somewhat more below superior. She had only two of the twenty-six categories rated below average. These were "Personality" and "Cooperation" in both of which categories plaintiff received a 3.5 rating (midway between average and needs improvement). The only suggested improvement on the evaluation was: "attitude at times."

The cattle were trucked to Columbia on March 29, 1988, sold on March 30, 1988, and the check for the proceeds issued on March 31, 1988, and delivered to Fred Dannov on March 31, 1988, with whom debtors had been discussing bankruptcy because they could not pay their creditors. The debtors owed some taxes as of April 15, 1988 (as who did not) and would have liked to use some of the proceeds to pay same.

The Bank claims that it discovered the sale on April 10, 1988, in a phone conversation initiated by an officer of the Bank to the debtors' home. Although there is disagreement between the parties, the Court must believe that the Bank did not know about the sale on March 31, 1988, or that the funds were in the hands of Mr. Dannov before April 10, 1989. By April 11th or 12th they knew of that fact and knew that Mr. Dannov was determining if the Bank was properly secured in said proceeds. By April 13, 1988, the Bank knew that debtors were filing bankruptcy as soon as Mr. Dannov had all of his material together to complete schedules and statements of affairs. The petition was mailed April 22, 1988, received and filed by the clerk's office on April 25, 1988.

Among the exhibits are two letters. The first is from Mr. Fay to Mr. Dannov. It is dated April 12, 1988. It makes demand for immediate payment of the funds Mr. Dannov was holding. On April 13, 1988, Mr. Dannov wrote to Mr. Fay that he would hold the funds until a Court determination as to the Bank's or trustee's right to said funds and would be filing a bankruptcy forthwith.

It was the Bank's evidence that this withholding of funds was improper, intransigent and uncooperative on the part of both debtors and Mr. Dannov. The Bank decided if those three parties were going to hold up the funds, the Bank was going to terminate plaintiff's employment. An extract of the minutes of the April 15, 1988 meeting of the directors of the Bank reflects that decision. The reason stated is:

"The Board feels the employment of Gerry Tinker must be terminated because mortgaged property was sold and the refusal to pay proceeds on loan."

The first portion of said statement is frankly self-serving and not in consonance with the past conduct between the Bank and the debtors. The Bank had been the principal credit extender to the debtors for over 20 years. Debtors had repeatedly marketed livestock pledged to the Bank at the same auction barn where these cattle were sold. The Bank had at least encouraged debtors to sell the instant livestock if not directed same. What the Bank was unhappy about, at least after April 13, 1988, was that the proceeds had not been turned over to it and instead they would have to proceed in Bankruptcy Court to test their lien.[1]

The Bank's first line of defense is that the termination occurred on April 20, 1988 or some five days prior to the filing of the petition. 11 U.S.C. § 525(b) says (in pertinent part): "No private employer may terminate the employment of ... an individual who is or has been a debtor ..." Thus says the Bank a strict reading of the section excludes the plaintiff from recovery because she neither was nor had been a

---

**1.** Subsequent to the filing, the Bank filed a motion on May 12, 1988; same was heard on June 2, 1988; the proceeds were ordered paid over to the Bank based on its properly perfected security interest.

debtor before she was terminated. There are two reasons why the Court declines to follow that argument. First, the Court cannot believe that it was the intent of Congress to set up a footrace between a prospective bankrupt and his or her employer. To follow the Bank's argument would be to say that if the employer can get the firing done one minute before the petition is filed, there never could be a § 525(b) complaint. The legislative history affords us some insight into what Congress did intend.

> "This section amends Section 525 of Title 11 to extend the protection against discrimination to persons employed in the private sector. Under this section, no private employer may terminate employment of or discriminate with respect to employment against any person on the basis that that person had been *or will be* a debtor in bankruptcy, or has suffered insolvency pending a discharge. (S.Rep. No. 98–65, 98th Cong. 1st Sess 80 (1983) (Senate Report accompanying S 445, Omnibus Bankruptcy Improvements Act of 1983, which was a forerunner to the Bankr. Amend. of 1984)."

Second, subsection (2) of subsection (b) of § 525 contemplates "insolvency before the commencement of a case ..." as substantial proof that it is not just the filing of the petition for relief that triggers the protection of 11 U.S.C. § 525(b).

The Bank next asserts that there is no proof that the termination was *solely* because plaintiff filed bankruptcy, or was insolvent prior thereto, or failed to pay a dischargeable debt. Here there is far more merit to the Bank's position. Plaintiff testified that the Bank told her she was being terminated because she, the debtor, and Fred Dannov would not turn over the proceeds of the sale of mortgaged property. The extract of the minutes of the Directors' Meeting said the same thing. The testimony of the two officers of the Bank was to that effect. In fact there is no evidence before the Court other than that the Bank was extremely upset that the $27,697.20 was not turned over to it and fired her for said reason. This Court surmises that the Bank was not happy about

the impending bankruptcy either. However, to paraphrase Chief District Court Judge Brimmer, the fact that an employer is displeased by employee's bankruptcy does not show violation of § 525(b). See *Stockhouse v. Hines Motor Supply (Wyoming), Inc.*, 75 B.R. 83 (D.Wyo.1987).

There is one other factor involved here that vitiates against the bankruptcy being the sole cause of plaintiff's termination. On April 1, 1988, the Federal Deposit Insurance Corp. started an examination. It was concluded by a wrapup on April 27, 1988. The Bank had had some problems and some classified loans. The Tinker loan was one of these. The Court believes that the Bank may have reacted as it did because of the presence of the F.D.I.C. examiners. Also, the F.D.I.C. report refers to the Tinker loan, the refusal to turn over the proceeds from the sale of the livestock, and the proposed termination of plaintiff, all without mention of any bankruptcy.

While the Court believes the prospective bankruptcy was a factor in the Bank's decision, the Court does not believe it was the sole factor and certainly does not fulfill the "solely" requirement of 11 U.S.C. § 525(b). In coming to this conclusion, the Court has considered in detail the analysis set out in *Bell v. Sanford–Corbitt–Bruker, Inc.*, slip opinion No. CV186–201, decided September 14, 1987, (S.D. Ga.) wherein District Judge Avant Edenfield suggests that "solely" within the context of § 525 should be defined as "playing a significant role" or "but for". Judge Edenfield also concludes that "the burden of proof allocations for proving a discriminatory discharge due to bankruptcy could be framed by analogy to race, color, religion, sex, or national origin cases". He then postulates that once a member of the class protected makes out a prima facie case of discriminatory discharge, it falls upon the employer to establish a legitimate, non-discriminatory reason for the action.

The Court finds that plaintiff carried her burden under such an analysis but also finds that the Bank established what it regarded as a legitimate reason for the action. In other words, the Court finds

that the Bank would have fired plaintiff whether she and debtor ever filed bankruptcy or not, once they and Mr. Dannov refused to turn over the $27,697.20 from the livestock sale. It seems to the Court then that if it believes the Bank was going to fire debtor, bankruptcy or no, it has no choice but to conclude that bankruptcy was not "solely" the reason therefor, no matter which way it defines that word. Accordingly, the Court rules against plaintiff on her complaint.

SO ORDERED.

The foregoing Memorandum Opinion constitutes Findings of Fact and Conclusions of Law as required by Rule 7052, Rules of Bankruptcy.