In re Norbert MAJEWSKI; In re Muriel Majewski, Debtors,

William J. Leonard, Trustee–Appellant,

v.

St. Rose Dominican Hospital, Appellee.

No. 01–15544.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 12, 2002.

Filed Nov. 13, 2002.

Adam Segal and James R. Chamberlain, Schreck Brignone Godfrey, Las Vegas, NV, for the appellee.

Randall Rumph, Rumph & Peyton, Las Vegas, NV, for the appellant.

Before: SCHROEDER, Chief Judge, D.W. NELSON and REINHARDT, Circuit Judges.

Opinion by Chief Judge SCHROEDER; Dissent by Judge REINHARDT

SCHROEDER, Chief Judge:

Debtor Norman Majewski incurred large medical expenses at the hospital where he was employed, and he did not pay them. After repayment negotiations failed, he told the hospital he intended to file for bankruptcy, and the hospital fired him before he did so. The trustee in Majewski's bankruptcy, William Leonard, now contends that the firing violated the bankruptcy code provision barring termination of an individual who "is or has been" a bankruptcy debtor "solely because" the individual is or has been a debtor in bankruptcy. 11 U.S.C. § 525(b).

The bankruptcy court dismissed the trustee's claim against the hospital for violation of the statute, holding that the statute did not protect persons who had not yet filed for bankruptcy. The district court affirmed. We affirm as well.

The anti-discrimination provision of the bankruptcy code provides:

No private employer may terminate the employment of, or discriminate with respect to employment against, an individual who is or has been a debtor under this title, a debtor or bankrupt under the Bankruptcy Act, or an individual

associated with such debtor or bankrupt, solely because such debtor or bankrupt—

(1) is or has been a debtor under this title or a debtor or bankrupt under the Bankruptcy Act;

(2) has been insolvent before the commencement of a case under this title or during the case but before the grant or denial of a discharge; or

(3) has not paid a debt that is dischargeable in a case under this title or that was discharged under the Bankruptcy Act.

11 U.S.C. § 525(b). In this appeal, Leonard contends that we should interpret the provision of subparagraph 1 liberally to apply to debtors before they file a bankruptcy petition.

In support of his argument, Leonard calls our attention to our cases interpreting the anti-retaliation provisions of remedial statutes such as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. We have interpreted those statutes to protect persons who report illegal conduct to government agencies or complain about such conduct to their employers, even though they have not yet instituted a formal proceeding. For example, in *Lambert v. Ackerley*, we held that the FLSA's anti-retaliation provision protected an employee who protested about the failure to pay overtime wages. *Lambert v. Ackerley*, 180 F.3d 997, 1001 (9th Cir.1999) (en banc). We so held even though the language of the relevant FLSA provision does not seem to expressly extend to persons who have not actually filed a formal complaint. That statute provides that it is unlawful:

> [T]o discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be insti-

tuted any proceeding under or related to this chapter, or has testified or is about to testify to in any such proceeding, or has served or is about to serve on an industry committee.

29 U.S.C. § 215(a)(3).

We pointed out, as the Supreme Court has noted, that the FLSA relies for its enforcement on the complaints of employees, rather than on monitoring payroll records or other government surveillance. *Lambert*, 180 F.3d at 1003 (quoting *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960)). In line with the remedial purposes of the statute, we therefore held that the anti-retaliation provision should be interpreted broadly, to give effect to the statute's remedial purpose. *Id.* (quoting *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597, 64 S.Ct. 698, 88 L.Ed. 949 (1944)). In so doing, we agreed with six of the seven other circuits to address the issue. *Id.* at 1003. We also noted that other courts had interpreted the anti-retaliation provisions of other remedial statutes equally broadly, in order to facilitate the enforcement of those statutes, which also rely on employee complaints about employer misconduct. *Id.* at 1006–07 (citing cases involving the Federal Mine Health and Safety Act, the Federal Railroad Safety Act, and the Clean Water Act). By protecting complaining employees' jobs, we intend to encourage reports of illegal activity.

■■■ The bankruptcy context of this case is very different. While we encourage reporting of statutory violations, we do not wish to encourage persons to file for bankruptcy or to threaten bankruptcy. We wish only to protect those persons who have invoked the bankruptcy law's protections to obtain a fresh start. *Sliney v. Battley (In re Schmitz)*, 270 F.3d 1254,

1258 (9th Cir.2001). The formal act of filing is more significant in bankruptcy than in the other contexts relied upon by the dissent. Filing a petition in bankruptcy triggers an automatic stay of actions against the debtor, the creation of an estate, and the appointment of a trustee. *See* 11 U.S.C. §§ 362, 541 and 701.

■ The dissent relies heavily on the legislative history from a 1983 bankruptcy bill that was never enacted. However, the statute enacted in 1984—the one now before us—is clear in its exclusive application to anyone who "is or has been" a debtor in bankruptcy. *See* 11 U.S.C. § 525(b). We therefore interpret the statute according to its terms, as the Supreme Court has instructed. *See U.S. v. Ron Pair Enters.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (in interpreting bankruptcy statutes, if "the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms' "). "[W]e are not free to substitute legislative history for the language of the statute." *Aronsen v. Crown Zellerbach,* 662 F.2d 584, 588 & n. 7 (9th Cir.1981) (citations omitted). We also express our suspicion that the legislative history upon which the dissent relies inaccurately reflects the intent of the bill's drafters. It is unlikely that Congress would have chosen the words "is or has been" to mean "has been or will be." *Compare* Omnibus Bankruptcy Improvements Act of 1983 (OBIA), S. 445, 98th Cong. § 352 (1983) and S.Rep. No. 98–65, at 80 (1983). In *Arden v. Motel Partners,* 176 F.3d 1226, 1229 (9th Cir. 1999), we explained that bankruptcy provisions will be interpreted according to their plain meaning "except in the rare cases[in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters." This is not such a case.

■ The bankruptcy provision at issue in this case forbids firing an employee solely because that person "is or has been" a debtor. 11 U.S.C. § 525(b). At the time the hospital fired Majewski, he was not, and had not been, a debtor in bankruptcy. The bankruptcy statutes therefore did not forbid the hospital from firing him. We reject Leonard's proposed reading of the statute, which is both inconsistent with the statute's text and incompatible with its purpose.

Bankruptcy's fresh start comes at the cost of actually filing a bankruptcy petition, turning one's assets over to the court and repaying debts that can be paid. One is not entitled to the law's protections, including employment security and the automatic stay of litigation, before being bound by its other consequences. We therefore affirm the bankruptcy court's dismissal of Leonard's action against the hospital.

AFFIRMED.

REINHARDT, Circuit Judge, dissenting:

Norman Majewski was hospitalized at St. Rose Dominican Hospital, and incurred substantial medical expenses. He later went to work for St. Rose, but in three years was unable to earn enough to discharge his medical debt. He then advised his employer that he intended to file for bankruptcy—but before he could actually file a formal petition, he was summarily fired.

Despite Congressional intent to enact legislation banning precisely such retaliation, the majority's opinion gives employers free license to punish an employee's good-faith efforts to become a protected debtor. Indeed, under today's holding, an employer may take advantage of a debtor's honesty by eliminating his most likely means to financial recovery. The majority

adopts an unnaturally rigid and formalistic construction of the Bankruptcy Code that contravenes Congress's clear intent: to insulate debtors from unfair employment practices directly tied to their attempts to get a "fresh start." Accordingly, I respectfully dissent.

I

The question whether an employee must have won the race to file a formal bankruptcy petition before he is fired in retaliation for his insolvent status is one of first impression in this circuit. "Because this is ... a question of first impression, we must 'look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy.'" *United States v. Miller*, 205 F.3d 1098, 1100 (9th Cir.2000) (quoting *United States v. Mohrbacher*, 182 F.3d 1041, 1048 (9th Cir.1999)).

Section 525(b) of the Bankruptcy Code provides:

"No private employer may terminate the employment of, or discriminate with respect to employment against, an individual who is or has been a debtor under this title, a debtor or bankrupt under the Bankruptcy Act, or an individual associated with such debtor or bankrupt, solely because such debtor or bankrupt—

(1) is or has been a debtor under this title or a debtor or bankrupt under the Bankruptcy Act;

(2) has been insolvent before the commencement of a case under this title or during the case but before the grant or denial of a discharge; or

(3) has not paid a debt that is dischargeable in a case under this title or

that was discharged under the Bankruptcy Act."

11 U.S.C. § 525(b).

The majority reads this provision to limit relief from employer discrimination to those who have succeeded in actually filing formal proceedings before they are victimized. The majority's reading is certainly one conceivable construction of the statute, but it is neither the only construction nor the construction most consistent with Congress's declared "object and policy."

With respect to the sequence in which an individual must have become a "debtor under this title" to receive protection from discrimination, the statutory language is not unambiguous. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341–45, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (finding similar ambiguity in Title VII regarding whether claimants must be employed at the time of filing to enjoy antiretaliatory protection); *In re Hudson*, 859 F.2d 1418, 1421 (9th Cir.1988) (finding similar ambiguity in the Bankruptcy Code regarding whether tort claims must have been reduced to judgment at the time of filing to be discharged). It is not entirely clear from the text of § 525(b), which forbids discrimination against an individual who "is or has been a debtor," whether a debtor must file for bankruptcy before he can be the subject of "discrimination," or whether the debtor merely must file for bankruptcy before seeking remedial relief under the statute.

It is possible to read the statute as the majority does, and find that discrimination based solely on an intent to file for bankruptcy remains entirely outside of the statutory purview as long as the discrimination occurs before the moment of filing. However, it can also be read to state that discrimination based on an intent to file for bankruptcy is comprehended by the statute, but becomes unlawful only if the

victim of discrimination actually files a formal petition. *Cf. Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 506 (9th Cir.2000) (noting that discrimination may be lawful under some circumstances). It can also be read to declare that discrimination based on an intent to file for bankruptcy is unlawful in all circumstances, but that a victim of discrimination only has a federal remedy under § 525(b) once he has filed a formal petition. As these three facially plausible interpretations demonstrate, the true meaning of the statute cannot be discerned with certainty from the text alone.[1]

When faced with textual ambiguity, our objective must be "to ascertain the intent of Congress and to give effect to legislative will." *United States v. Taylor*, 802 F.2d 1108, 1113 (9th Cir.1986), *cert. denied*, 479 U.S. 1094, 107 S.Ct. 1309, 94 L.Ed.2d 164 (1987). Indeed, even the clear text of the Bankruptcy Code may be non-conclusive in the " 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' In such cases, the intention of the drafters, rather than the strict language, controls." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (citations omitted) (quoting *Griffin v.*

*Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982), in an interpretation of the Bankruptcy Code). *See also Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) (construing the Bankruptcy Code to effect Congressional intent despite text potentially suggesting alternative readings).

The majority's construction of § 525(b), permitting an employer to fire a debtor after it has been informed of the debtor's intention to invoke the Bankruptcy Code, "produce[s] a result demonstrably at odds with the intentions" of its drafters. "This Court on numerous occasions has stated that '(o)ne of the primary purposes of the Bankruptcy Act' is to give debtors 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.' " *Perez v. Campbell*, 402 U.S. 637, 648, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)).

Specifically, Congress enacted the antidiscrimination provisions of § 525 to codify *Perez v. Campbell* and to ensure that employers are not able to "frustrate the Congressional policy of a fresh start for a debtor." S. REP. NO. 95–989, at 81 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5867.[2] As the House Report stated,

---

**1.** Under all three readings, it is plain that the debtor must file a bankruptcy petition before seeking *relief* under the statute. To that extent, I agree with the majority that the statute "is clear in its exclusive application to anyone who 'is or has been' a debtor in bankruptcy." Maj. op. at 655–56. Majewski is squarely within the statute's purview; he filed for Chapter 7 bankruptcy well before seeking relief for his unlawful termination.

Although I agree that the statute only "applies" to individuals who are or have been debtors, this does not, of course, resolve the entirely different question at issue in this case: whether a debtor who is fired solely because he declared his intent to file for bank-

ruptcy must have formally filed his petition before he was fired. This is the question truly at issue—and one that is not clearly resolved by the ambiguous text of the statute. Accordingly, the majority's repetition of the hoary rule that we must interpret statutes according to their plain meaning does not assist us in deciding this case.

**2.** This Report accompanied the enactment of § 525(a), which prohibits discrimination against debtors by government entities. Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, § 525, 92 Stat. 2549, 2593. Section 525(b), regulating private discrimination, was not enacted until six years later. Bankruptcy Amendments and Federal Judgeship Act of

"The purpose of [§ 525] is to prevent an automatic reaction against an individual for availing himself of the protection of the bankruptcy laws." H.R. REP. NO. 95–595, at 165 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6126. The hospital's "automatic reaction" against Majewski in this case is precisely the type of invidious conduct that Congress intended to prevent.

In a precursor to the bill enacting § 525(b), Congress made its intent even more plain. The precursor bill, proposed one year before § 525(b) was enacted, contained the same language as § 525(b): "No private employer may terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title ...." Omnibus Bankruptcy Improvements Act of 1983 (OBIA), S. 445, 98th Cong. § 352 (1983).[3] Notably, in the legislative history to that bill, Congress made clear what it intended by the phrase "a person that is or has been a debtor under this title":

> This section amends section 525 of title 11 to extend the protections against discrimination to persons employed in the private sector. Under this section, no private employer may terminate employment of or discriminate with respect to employment against any person on the basis that that person has been *or will*

*be* a debtor in bankruptcy, or has suffered insolvency pending a discharge. S. REP. NO. 98–65, at 80 (1983) (emphasis added).

Congress thus understood the language "is or has been" to embrace individuals who "will be" debtors in bankruptcy proceedings.[4] Although the majority construes § 525(b) to protect only debtors who have already filed formal bankruptcy petitions, this legislative history shows that Congress clearly intended the section to have a broader scope.

A broad interpretation also comports with Congress's expectations of the latitude with which the judiciary should construe the provision. Congress explicitly welcomed an expansive judicial reading of the anti-discrimination portions of the bankruptcy code. As the Senate Report accompanying § 525 stated: "[This] section is not exhaustive. The enumeration of various forms of discrimination against former bankrupts is not intended to permit other forms of discrimination. The courts have been developing the *Perez* rule. This section permits further development.... The courts will continue to mark the contours of the anti-discrimination provision in pursuit of sound bankruptcy policy." S. REP. NO. 95–989, at 81 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5867.[5]

1984 (BAFJA), Pub.L. No. 98–353, § 309, 98 Stat. 333, 354. However, because the provisions of § 525(b) are, for all relevant purposes, identical to those of § 525(a), the legislative history of § 525(a) provides relevant guidance to Congress's intent in enacting § 525(b).

3. The only difference between the language in the 1983 OBIA and the language in the 1984 BAFJA is that the OBIA protected a "person" while the BAFJA protects an "individual." *Cf. In re County Schs., Inc.*, 163 B.R. 424, 430 n. 7 (Bankr.D.Conn.1994) (discussing the distinction).

4. *Cf. Costa v. Desert Palace, Inc.*, 299 F.3d 838, 850 (9th Cir.2002) (en banc) (finding the legislative history of the defeated Civil Rights Act of 1990 instructive in determining Congressional intent regarding the Civil Rights Act of 1991).

5. *See also* H.R. REP. NO. 95–595, at 165 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6126 ("These [retaliatory discharges of bankrupt employees] are seriously detrimental to a debtor's fresh start, and are contrary to bankruptcy policy. The courts have followed the *Perez* doctrine in some of these instances, and have restored bankrupts to positions from which they were excluded because of the

## II

Only two other federal courts have construed the provision of § 525(b) at issue here. In *In re Tinker*, 99 B.R. 957 (Bankr.W.D.Mo.1989), the bankruptcy court determined that a debtor fired seven days after she notified her employer of her intent to file for bankruptcy and two days before mailing her bankruptcy petition qualified for protection under § 525(b).[6] As the court explained, "the Court cannot believe that it was the intent of Congress to set up a footrace between a prospective bankrupt and his or her employer. To follow the[employer's] argument would be to say that if the employer can get the firing done one minute before the petition is filed, there never could be a § 525(b) complaint." *In re Tinker*, 99 B.R. at 960.

The other federal case to reach the issue was *In re Kanouse*, 168 B.R. 441 (S.D.Fla. 1994), *aff'd*, 53 F.3d 1286 (11th Cir.1995). *Kanouse* involved an employee constructively discharged two *months* after the employer received notice of his potential bankruptcy filing, and seven *months* before the employee actually filed for bankruptcy. The *Kanouse* court espoused the same flawed formal construction of § 525(b) that the majority has chosen in the instant case. In so doing, however, it emphasized that there was no need to address the *Tinker* "race scenario since Kanouse filed his Chapter 11 petition almost seven months after his [alleged constructive discharge]." *In re Kanouse*, 168 B.R. at 448.

I believe that the *Tinker* application of § 525(b) more closely comports with Congressional will. As *Tinker* recognized, the

construction favored by *Kanouse* and the majority sets up a footrace whereby an employer determined to retaliate against an employee for expressing an intent to get a "fresh start" need only fire the employee before he is able to file his formal petition. According to the majority, the employer's efforts to penalize the debtor for exercising federal statutory rights are then insulated from challenge.

In similar contexts, however, Congress has made clear that it does not countenance such a race to wrongdoing. Indeed, in a 1990 amendment to the bankruptcy code, Congress explicitly commended the Ninth Circuit for construing the code broadly—and correctly—in its efforts to prevent legal protections from turning on a "race to the courthouse." S. REP. NO. 101–434, at 6 (1990), *reprinted in* 1990 U.S.C.C.A.N. 4065, 4069 (approving of the broad construction adopted by *In re Hudson*, 859 F.2d 1418 (9th Cir.1988)). We should afford the debtor protection provisions of § 525(b) a similarly broad interpretation in this case.

Moreover, this circuit and most of the other circuits have consistently construed the anti-discriminatory provisions of other remedial statutes broadly. Even before the filing of a formal court document, an individual's clearly expressed intent to proceed with the exercise of a statutory right triggers the anti-retaliatory protections of the National Labor Relations Act (NLRA), *see, e.g., N.L.R.B. v. Scrivener*, 405 U.S. 117, 121–24, 92 S.Ct. 798, 31 L.Ed.2d 79 (1972); the Fair Labor Standards Act (FLSA), *see, e.g., Lambert v. Ackerley*, 180 F.3d 997, 1007 (9th Cir.1999) (en banc),

---

bankruptcy. The doctrine is a developing doctrine, and its precise ultimate contours are not yet clear. More case law will undoubtedly develop the extent of the discrimination that is contrary to bankruptcy policy.").

**6.** The *Tinker* court ultimately denied the debtor employee's § 525(b) claim because it found that the employee did not prove that she was terminated "solely because" of her bankrupt status. *In re Tinker*, 99 B.R. at 960–61.

*cert. denied,* 528 U.S. 1116, 120 S.Ct. 936, 145 L.Ed.2d 814 (2000); the Energy Reorganization Act, *see, e.g., MacKowiak v. Univ. Nuclear Sys., Inc.,* 735 F.2d 1159, 1162–63 (9th Cir.1984); Title VII, *see, e.g., Gifford v. Atchison, Topeka & Santa Fe Ry. Co.,* 685 F.2d 1149, 1155–56, 1156 n. 3 (9th Cir.1982); the Surface Transportation Assistance Act (STAA), *see, e.g., Clean Harbors Envtl. Servs., Inc. v. Herman,* 146 F.3d 12, 19–21 (1st Cir.1998); the Clean Water Act (CWA), *see, e.g., Passaic Valley Sewerage Comm'rs v. U.S. Dep't of Labor,* 992 F.2d 474, 478–80 (3d Cir.), *cert. denied,* 510 U.S. 964, 114 S.Ct. 439, 126 L.Ed.2d 373 (1993); the Federal Railroad Safety Act (FRSA), *see, e.g., Rayner v. Smirl,* 873 F.2d 60, 64 (4th Cir.), *cert. denied,* 493 U.S. 876, 110 S.Ct. 213, 107 L.Ed.2d 166 (1989); and the Mine Safety Act (MSA), *see, e.g., Phillips v. Interior Bd. of Mine Operations Appeals,* 500 F.2d 772, 779–83 (D.C.Cir.1974), *cert. denied,* 420 U.S. 938, 95 S.Ct. 1149, 43 L.Ed.2d 415 (1975).

The majority concedes that these remedial statutes have all been construed to provide anti-retaliatory protection *before* a formal filing. However, my colleagues contend that these statutes are distinguishable in that they are, in effect, "whistle-blower" statutes designed for a different purpose than the Bankruptcy Code. *See* Maj. Op. at 655 (claiming that the above statutes were interpreted broadly because employees must be protected to "encourage reports of illegal activity").

Apparently, the majority believes that, unlike the Bankruptcy Code, these statutes deserve broad interpretation only because the employees they protect are useful cogs in a law enforcement machine.

The majority's purported distinction is incorrect on both counts—the remedial statutes that we construe broadly depend on neither "cog" status nor law enforcement motive. The discrimination provisions of the remedial statutes above do not require that a prospective plaintiff be merely one of many affected by adverse action or that he be reporting general corporate wrongdoing. Rather, these provisions protect an employee from discrimination that is unleashed because his employer wishes to discourage *him* from exercising an *individual* statutory right.[7] Under the FLSA, an employee is protected against discrimination by his employer if he simply seeks to work under conditions to which he is statutorily entitled. *See Lambert,* 180 F.3d at 1001, 1004 (protecting an employee attempting to assert her individual statutory right to overtime pay). The protection attaches even if the action is entirely selfish—even if the majority's would-be "cog" is the sole beneficiary.[8] The same is true under the NLRA, *see Scrivener,* 405 U.S. at 119, 121–24, 92 S.Ct. 798 (protecting an employee attempting to assert his individual statutory right to vote for union representation); Title VII, *see Gifford,* 685 F.2d at 1154–57, 1156 n. 3 (protecting an employee attempting to assert her individual

---

**7.** Only two of the anti-discrimination provisions above—those in the Clean Water Act (water pollution) and those in the Energy Reorganization Act (nuclear safety)—even arguably exist to protect employees because their reports of illegal activity will further administrative enforcement wholly detached from the wrongs done the employees themselves.

**8.** Of course, these anti-discrimination provisions also serve to safeguard employees who challenge wrongdoing that harms others. The point is that employees are protected even if they intend to assert a statutory right *only on their own behalf.* In all of these statutes, Congress made a clear policy choice to ensure that an employee's exercise of his individual statutory right would not be penalized.

statutory right to a position based on gender-neutral qualifications); the STAA, *see Clean Harbors*, 146 F.3d at 15 n. 1, 19–21 (protecting an employee attempting to assert his individual statutory right to a safe work environment); and the MSA, *see Phillips*, 500 F.2d at 775, 778–83 (same). For the same reason, this protection should attach for an employee attempting to assert his individual statutory right to file for bankruptcy.

Moreover, the statutory rights above are not protected from discrimination solely because such protection helps to ferret out violations of law. By banning particular conduct, it is true that the statutes discussed above vest individuals with "negative rights"—the right to be free from unlawful activity like unfair labor practices. And it is true that the Bankruptcy Code instead establishes an affirmative right to enjoy specific legal protections. Yet these laws are of undeniably equal status. Both establish rights by clear Congressional command, and each must therefore be protected with equal fervor.

State courts have recognized the need for similar protection in construing their worker's compensation statutes—statutes with anti-discrimination provisions that are broadly construed despite the fact that they do not involve the reporting of employer wrongdoing, but, like the Bankruptcy Code, are designed to protect the employee's right to file individual claims that address his independent injuries, physical or economic. Many state worker's compensation statutes contain anti-discrimination provisions mirroring those in the federal statutes discussed above. Yet even in the face of statutory language that appears to offer protection only after the filing of a formal claim, most state courts that have examined these provisions have broadly construed the protection they offer. In these states, employees are regularly pro-

tected from retaliatory discrimination even if they have not yet filed formal worker's compensation claims—because such protection furthers the legislature's remedial intent. *See, e.g., Nicholson v. Transit Mgmt.*, 781 So.2d 661 (La.Ct.App.2001); *Keystone Foods Corp. v. Meeks*, 662 So.2d 235 (Ala.1995); *Abels v. Renfro Corp.*, 335 N.C. 209, 436 S.E.2d 822 (1993); *Overnite Transp. Co. v. Gaddis*, 793 S.W.2d 129 (Ky.Ct.App.1990); *Buckner v. Gen. Motors Corp.*, 760 P.2d 803 (Okla.1988); *Roseborough v. N.L. Indus.*, 10 Ohio St.3d 142, 462 N.E.2d 384 (1984); *Delano v. City of S. Portland*, 405 A.2d 222 (Me.1979); *Tex. Steel Co. v. Douglas*, 533 S.W.2d 111 (Tex. Civ.App.1976).

Like the anti-discrimination clauses of the statutes above, the anti-discrimination provision of the Bankruptcy Code protects an employee seeking to exercise his statutory right. The broad construction that courts grant these other remedial statutes should therefore serve as a guide to the proper interpretation of § 525(b). *See Lambert*, 180 F.3d at 1003 ("[The statute is] remedial and humanitarian in purpose. We are not here dealing with mere chattels or articles of trade but with the rights of those who toil. . . . Those are rights that Congress has specifically legislated to protect. Such a statute must not be interpreted or applied in a narrow, grudging manner.") (internal quotation marks omitted) (quoting *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597, 64 S.Ct. 698, 88 L.Ed. 949 (1944)). By refusing to apply the same broad interpretive lens to the protective provisions of the Bankruptcy Code that courts across the nation apply to other remedial statutes, the majority today leaves dangerously vulnerable employees' statutory right to a "fresh start," and helps frustrate the policies and objectives of the Bankruptcy Code.

## III

The majority's opinion not only contravenes Congressional intent and departs from our interpretation of similar statutes—it also establishes a policy that protects none of the parties involved.

Despite the Congressional mandate to give debtors a "fresh start," the majority's construction does not protect the debtor employee. Under the rule the majority sets forth, debtor employees may be terminated as soon as an employer discovers that they are contemplating bankruptcy, even if they are fired solely because they seek to exercise a right under the Bankruptcy Code. Indeed, under the majority's ruling, debtor employees may apparently be terminated minutes before they file a bankruptcy petition. Allowing an employer to deprive an insolvent employee of his principal means of future financial support solely because that employee seeks bankruptcy protection hardly grants debtors the "fresh start" they deserve. Nor does the majority's construction protect the creditor employer. The majority's rule discourages debtor employees from discussing their financial status with creditor employers before officially filing a bankruptcy petition. This effectively forecloses any opportunity for the creditor employer to negotiate revised payment terms outside of the rigid constraints of a bankruptcy proceeding. Because the majority's rule will unnaturally silence employees on the brink of insolvency, a creditor employer with a junior interest may find that interest suddenly and unexpectedly extinguished in an unforeseen bankruptcy proceeding.

It is worth noting that a construction of the Code that prohibited discrimination against would-be debtors would not create undue employment security for employees who fraudulently threaten bankruptcy in order to hold onto their jobs—in case the majority actually fears such a possibility. Employers would remain protected by the high standard of proof required to show discrimination under § 525(b). An employee seeking relief would still be required to show that discriminatory employment actions were undertaken "solely because" of the employee's bankrupt status.[9] 11 U.S.C. § 525(b). And, of course, as with anti-discrimination provisions in other statutes, only employees who intend in good faith to invoke their statutory bankruptcy right within a reasonable period would be protected. *See, e.g., Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845, 845 n. 1 (9th Cir.2002) (discussing the good-faith requirement in anti-discrimination provisions of the False Claims Act and Title VII).

## IV

The majority's explanation of its underlying concerns may shed light on the reason it improperly elects to interpret § 525(b) in such a "narrow, grudging manner." *Lambert*, 180 F.3d at 1003. According to my colleagues, "we do not wish to encourage persons to file for bankruptcy or threaten bankruptcy."[10] Maj. Op. at

---

9. Indeed, in the case that held that an employee terminated prior to filing a bankruptcy petition is eligible for relief under § 525(b), relief was ultimately denied because the employee could not prove that she was terminated solely because of her bankrupt status. *In re Tinker*, 99 B.R. at 960–61.

10. Despite the claim that my colleagues "do not wish to encourage persons to file for

bankruptcy," Maj. Op. at 655, such encouragement is precisely the result brought about by their decision. Insolvent employees faced with the prospect of either losing their jobs if they discuss their financial plight with their employers before filing a petition, or keeping their jobs by filing a bankruptcy petition without informing their employers in advance of their intent to do so, will inevitably opt to file

655. I strongly disagree with this second-guessing of Congress's determination that bankruptcy proceedings serve an important social purpose. Our bankruptcy laws establish a constructive regime designed to aid those who need a means of surmounting the overwhelming financial obstacles that confront so many residents of this country today. Congress saw fit to establish a bankruptcy system that gives a "fresh start" to those who find themselves in intolerable financial difficulty. This policy choice was its clear prerogative. That individuals with insuperable financial problems will file for bankruptcy protection is a state of affairs to be recognized, not feared. Where Congress has seen fit to protect employees seeking bankruptcy from discrimination by their employers, we have a duty to staunchly defend that effort to afford protection. We have no business discouraging attempts to invoke bankruptcy protection; nor should we fear that we may be encouraging such action. This is particularly so when that which the majority fears encouraging—the good—faith claim of protection by a working person who is unable to earn enough to pay his substantial medical bills—is the very scenario the statute was designed to protect.

Bankruptcy is not only for companies like Enron and Worldcom. *See, e.g.,* Enron Corp., Bankr.Filing, No. 01–16034 (Bankr.S.D.N.Y. Dec. 12, 2001); MCI Worldcom Int'l, Inc., Bankr.Filing, No. 02–42226 (Bankr.S.D.N.Y. July 21, 2002). Individual employees have the same right to seek bankruptcy protection as large corporations—and Congress has determined that they should be able to do so without

fear of losing their livelihood as a result. Section 525(b) was enacted to protect the Majewskis of the world from the sort of direct retaliatory discrimination encountered here, and to ensure that individuals are able to receive the same fresh start as some of our less deserving corporate predators. A worker like Majewski should not be stripped of his rights either because his employer succeeds in firing him before he can get his papers on file in bankruptcy court, or because this court is afraid of encouraging him to avail himself of a remedy that Congress intended be available to him. The majority's unduly narrow construction of the Bankruptcy Code unjustly undoes an important part of the protections that Congress intended to offer working people. For that reason, I dissent.

first and talk later. This removes any last vestige of pre-bankruptcy flexibility. If we are to effectuate the substantive goals of the bankruptcy scheme, insolvent employees must be free from the prospect of retaliatory discharges in response to good-faith offers to renegotiate existing debt. *Cf. Lambert,* 180

F.3d at 1007. There is no more effective way to nullify the balanced incentives inherent in a bankruptcy action than to force insolvent employees to choose between continued employment or the premature submission of a court petition. *Cf. Hansen v. Harrah's,* 100 Nev. 60, 675 P.2d 394, 397 (1984).