VINSON, District Judge,
dissenting:
This is a very troubling case that raises a number of significant legal issues. I will limit the focus of my dissent, however, to what I believe is the most serious and manifest error: the jury instructions.
This is also a very important case, for retaliation claims based on federal statutes are increasingly a major part of employment litigation in federal courts. Recent cases from the Supreme Court of the United States, see note 3 infra, have highlighted new interpretations of the causation standard in some of these cases. All parties who deal with those laws, including employers and employees, their attorneys, district judges, and trial juries, need more clarification and certainty in this area. Unfortunately, the majority’s opinion does not provide that.
I
Before turning to the jury instructions, it might be helpful to briefly discuss the nature of the testimony at issue in this case. The majority repeatedly states that Avila and two fellow officers, Romney and Anderson, were disciplined only after they testified in the Maciel litigation. See, e.g., Maj. Op. at 1098 (“[The] termination occurred only after Avila had testified in [the Maciel suit.]”); accord id. at 1099 (“The evidence at trial was that the only officers disciplined ... were those who testified against the LAPD in the Maciel suit[.]”). Although technically true, the substance of their Maciel testimony is critical, as Avila, Romney, and Anderson were also the only officers who had openly admitted to insubordination while they testified. Specifically, they admitted that for several years they failed to report overtime — and faded to report supervisors who allegedly told *1106 them to do so — even though they knew it was “serious misconduct” for which they could be fired. Accordingly, when the majority says “the only officers singled out for discipline were those who testified at the Maciel action”, id. at 1103-04, it is more complete and factually accurate to say that “the only officers singled out for discipline were those who testified at the Maciel action and who admitted under oath that for years they knowingly and repeatedly violated policies that they were specifically told would subject them to termination.” It is important to keep in mind that Avila, Romney, and Anderson did more than “testify” in the Maciel case.[1]
To the extent that the majority appears to believe that someone who testifies in an otherwise protected hearing is, ipso facto, immunized from the consequences of any self-incriminating admissions made during his testimony, I disagree. There is a clear and legally recognized distinction between the mere act of testifying on one hand and, on the other hand, making admissions while testifying that provide independent grounds for discipline. See Merritt v. Dillard Paper Co., 120 F.3d 1181, 1188-91 (11th Cir.1997) (concluding that an employee who testified in a protected Title VII case and admitted sexual harassment could be fired and that in “virtually every” such case the employer would be entitled to summary judgment, absent direct evidence of retaliation or pretext); cf. Lane v. Franks, — U.S. -, 134 S.Ct. 2369, 2381 n. 5, 189 L.Ed.2d 312 (2014) (noting in a First Amendment retaliation case: “Of course ... wrongdoing that an employee admits to while testifying may be a valid basis for termination or other discipline.”). Although the act of testifying is protected, the testimony itself is not privileged. This distinction is rooted in both reason and common sense.[2]
Now to the jury instruction problem.
II
The FLSA makes it unlawful to take adverse action against an employee “because such employee has ... testified” in a FLSA proceeding. 29 U.S.C. § 215(a)(3). As this court previously explained in the Title VII context, to prove a violation of such a statute, an employee may have evidence from which “the only reasonable conclusion a jury could reach is that discriminatory animus is the sole cause for the challenged employment action or that discrimination played no role at all in the employer’s decisionmaking!.]” See Costa v. Desert Palace, Inc., 299 F.3d 838, 856 *1107 (9th Cir.2002) (emphasis in original), aff'd 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). In such “sole cause” (or “pretext”) cases, the jury must be instructed “to determine whether the challenged action was taken ‘because of the prohibited reason,” and, if the jury finds that it was, the employee prevails. Id. If, on the other hand, the jury determines that it “played no role at all”, the employer prevails. Id.
However, where there is evidence of more than one potential cause for the adverse action (so-called “mixed motive” cases), a different instruction should be used. Thus, if the evidence at trial “could support a finding that discrimination is one of two or more reasons for the challenged decision, at least one of which may be legitimate, the jury should be instructed to determine first whether the discriminatory reason was ‘a motivating factor’ in the challenged action.” Id. at 856-57. If the jury answers that question in the affirmative, the employee prevails unless the employer can then prove that it would have made the “same decision” even if the impermissible factor (protected activity) had not been considered. See id. at 857; accord Knickerbocker v. City of Stockton, 81 F.3d 907, 911 & n. 2 (9th Cir.1996) (holding same in the FLSA retaliation context). In other words, if there is enough evidence to support it, the “mixed motive” jury instruction is called for, where the appropriate causation standard is only “a motivating factor” but which must be coupled with a “same decision” affirmative defense instruction.
Before trial, Avila proposed a “sole cause” instruction under Ninth Circuit Model Instruction No. 10:3, which provided that he would prevail on his claim if he showed: (1) that he engaged in protected conduct; (2) that he was subjected to an adverse job action; and (3) that he was subjected to that action “because of’ the protected conduct. The City objected to the instruction as it did not account for its defense that there were valid, independent, and nonretaliatory grounds for Avila’s termination- — namely, his admitted insubordination — and that the LAPD “would have acted as it did regardless of any protected activity by plaintiff.” The City thus requested a “mixed motive” jury instruction with the “motivating factor” causation standard, along with the following “same decision” affirmative defense:
If the plaintiff has proved all three of these elements, the plaintiff is entitled to your verdict, unless the defendant has proved by a preponderance of the evidence that it would have made the same decision even if the plaintiffs participation in a protected activity had played no role in the employment decision. In that event, the defendant is entitled to your verdict, even if the plaintiff has met his burden of proof on all three of the above elements.
(Emphasis added). This “same decision” defense instruction was taken verbatim from the “mixed motive” alternative instruction in the then-current Ninth Circuit Model Instruction No. 10:3.[3]
*1108 The City also proposed the two special instructions that the majority has quoted in full. See Maj. Op. at 1101-02. The underlying purpose of these instructions was to tell the jury of the distinction between the act of testifying, which cannot serve as a basis for adverse action, and admitting to misconduct while testifying, which can.
The trial judge rejected both special instructions, but he appeared to agree that the evidence supported a “mixed motive” instruction. Yet, he ended up giving a combination of a portion of the “mixed motive” and a portion of the “sole cause” instructions.[4] First, he instructed the jury that Avila would prevail if he proved that his testimony in Maciel was “a motivating factor” for the challenged action, which the court defined as “a reason that contributed to the decision to take certain action even though other reasons also may have contributed to the decision.” So far, so good. However, the judge went astray by omitting the “same decision” affirmative defense language from this circuit’s model instruction and, instead, instructing the jury as follows on the City’s defense:
[I]f the defendant has proved by a preponderance of the evidence that the the adverse employment decisions, the defendant is entitled to your verdict.
This instruction has nothing to do with the “same decision” defense, and it mixes apples with oranges. It told the jury that Avila would prevail if he proved that his participation in the protected activity was “a motivating factor” (i.e., a contributing reason among others) for the adverse action, which could then be overcome only if the City could turn around and prove that the protected activity “played no role” at all. This illogical and internally inconsistent instruction was not the same decision affirmative defense set out in the Ninth Circuit pattern jury instructions, which the City had requested.[5]
On this issue, Knickerbocker is instructive. That was a mixed motive FLSA *1109 retaliation ease in which the employee argued that the adverse employment action “should be deemed retaliatory if the protected conduct was ‘in any way’ a part of the employer’s decision”, 81 F.3d at 911 n. 2, which is merely the inverse way of arguing that the employer, to prevail, must demonstrate that the protected conduct “played no role” in the decision. This circuit rejected that argument, stating that it was “wiser” to conclude in FLSA mixed motive cases that the employer need only prove that, although the protected conduct “played a role,” it would have done the same thing even if “the proper reason alone had existed.” See id. at 911 & n. 2.[6]
Notably, the majority opinion does not dispute that the “no role” instruction was erroneous. Instead, it appears to suggest three reasons why that error does not warrant reversal: waiver, insufficient evidence, and harmless error.
A.
For its first rationale, the majority contends that the error has been waived because the City did not clearly and distinctly raise the issue in its opening brief. See Maj. Op. at 1100-01. Although the City had requested the Ninth Circuit’s pattern “mixed motive” instruction — which included the incorporated “same decision” affirmative defense — it did not expressly object to the “no role” instruction that was given.[7] Rather than assign error to that instruction, the City has instead argued that the court erred in not giving the two special instructions that sought to explain the pivotal distinction between taking an action because an employee testified, and taking an action because he admitted to misconduct while testifying. There are two reasons why waiver does not apply here.
First, even though the City did not specifically object to the instructions as they were originally given, we can review jury instructions for plain error in civil cases. See Fed.R.Civ.P. 51(d)(2). Plain error is: “(1) error, (2) that is plain, and (3) that affects substantial rights.... If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.” United States v. Cotton, 535 U.S. 625, 631, 122 S.Ct. 1781, 1785, 152 L.Ed.2d 860 (2002) (quotation marks, citations, and brackets omitted) (emphasis added). It is apparent to me that the failure to give the “same decision” instruction that the City had requested was plain error on the facts of this case, as it deprived the City of its entire defense and thus seriously affected the fairness and integrity of the trial.
To prevail on his retaliation claim, the jury was instructed that Avila had to prove: (1) that he was engaged in protected activity when he testified in the Maciel case; (2) that he was then subjected to an adverse employment action; and (3) that his Maciel testimony was a “motivating factor” in the decision to take that adverse action. This is a somewhat unique case in *1110 that all three elements — from the jury’s perspective — were essentially indisputable. As for the first two, Avila obviously engaged in protected activity by testifying in the Maciel action, after which he was obviously subjected to adverse action. As for the third element, because the City’s entire defense was that it took the adverse action based upon the misconduct that Avila admitted during his testimony, the protected activity obviously “contributed to” the decision to take that action. The trial judge specifically instructed the jury that: “If the plaintiff has proved all three of these elements, the plaintiff is entitled to your verdict.” These are the first three elements of this circuit’s pattern “mixed motive” instruction — but the judge left out the same decision affirmative defense, which is what the “mixed motive” instruction is all about. Consequently, the jury was told that the only way for the City to avoid liability, per the judge’s deviation from the pattern instruction, was if it could somehow prove that the trial testimony in Maciel “played no role” in the action— which, of course, it could not possibly do. In other words, there was no way for the City to prevail under the instructions as given to the jury, and the outcome of the case was predetermined. I believe this instructional error was plain.[8]
Furthermore, even if the trial judge’s failure to give the “same decision” instruction was not plain error, this issue was not waived because that omission plus the inconsistent “no role” instruction that was given led directly to — and aggravated — the jury’s obvious confusion, and it cannot be separated from the equally meritorious special instructions argument that the City has advanced on appeal. As will be seen, the two arguments are inextricably interrelated.
During their first full day of deliberations, the jurors (who had deliberated only part of the day before) sent out a note asking the following three questions:
Is testimony given at an FLSA action protected? Then, can that testimony be used as evidence in a trial? Is the physical act of testifying the protected activity under FLSA, or is the testimony protected or both?
Both counsel and the trial judge agreed that the answer to the first two questions was “yes,” but there was disagreement as to the third. Avila’s lawyer suggested at the time that the act of testifying and the testimony itself were both protected, but the City’s lawyer believed that was legally incorrect because, “obviously, there’s examples, if you admitted committing a homicide in an FLSA proceeding, I don’t *1111 think anybody would argue that would be protected activity.” Although the judge could have easily answered the third question, he ultimately decided (with both counsel agreeing) to respond by simply rereading a previous stipulation reflecting that Avila had testified in the Maciel action and that “[t]he giving of this testimony is protected activity under the [FLSA].”
The jury continued to deliberate the rest of that day. Still confused on the third day, however, it sent out a second series of questions:
If testimony given in an FLSA proceeding is protected, is it legal to use that testimony against the person testifying? If it is legal to use that testimony against the person testifying, then, how is that testimony protected?
The trial judge’s following summary of these questions as he began his discussion with counsel accurately describes the jury’s dilemma:
My sense is that the jury is caught in a circular reasoning process. It would appear that the jury should be told that a person can testify in an FLSA proceeding, that the testimony is protected, that in this case the LAPD could not terminate the plaintiff ... for testimony — the fact that he testified in the FLSA proceeding.
The follow-up is that they could terminate him if the department concluded that he made an admission in that testimony that provided separate but good cause to terminate him.
So, they can’t terminate him for testifying, but they can terminate him if he made an admission that provided separate grounds for termination that arose to good cause.
Avila’s counsel replied that he “generally agree[d] with what the court is trying to communicate.” However, he maintained that it was “more precisely stated” in the (erroneous) “motivating factor/no role” instruction that had already been given to the jury. After quoting from that instruction, Avila’s attorney stated as follows:
So, in order for the jury to say in this case under the law that there is not a motivating reason, they must be able to affirmatively say the defendant has proved by a preponderance of the evidence that plaintiffs testimony in Ma-ciel played no role in any of the adverse employment decisions.
Because what is incumbent upon the defense to show is it’s not a motivating reason. And the flip side of a motivating reason — or should I say the inverse of a motivating reason is that the protected activity played no role, which is covered in the jury instruction that the court has given.
(Emphasis added).[9] Defense counsel responded by agreeing with what the trial judge had said at the beginning of the discussion, i.e., that there is “a distinction between the act of testifying ... versus the content of the testimony!.]” He then reminded the court: “We proposed two special instructions that directly address this pivotal issue. Those instructions were rejected by the court. Let me reoffer them for the court to consider because it does seem since the jury has the [“motivating factor/no role” instruction] they’re struggling with it.” The judge once again rejected the two special instructions and {over the City’s objection) decided to reread the erroneous instruction to the jury because, he said, “this is getting way too *1112 complicated.” After the judge announced what he planned to do, the City made one last attempt and requested, in the alternative, that the judge at least give the jury “the explanation that you provided to counsel when you came on to the bench, the distinction between the giving of testimony and the use and contents of the testimony.” The court replied “that will not be done at this time.”
The trial judge thus not only failed to correct the erroneous instruction — by giving “special instructions” that could have freed the clearly struggling jury from the “circular reasoning process” that he himself believed it was “caught in” — but he actually repeated and compounded the original error by just re-reading the same erroneous instruction. This sequence shows the inseparable overlap between the original instructional error regarding the lack of a proper “same decision” defense (which has not been directly raised on appeal) and the court’s response to the jury questions and refusal to give the special clarifying instructions (which has been).
In sum, Avila obviously engaged in protected activity when he testified in Model, but it is also obvious that he admitted to “serious misconduct” during his testimony, which provided a legitimate basis for discipline. Prior to trial, the City requested special instructions to address that issue, but they were rejected. After the jury was inexplicably told that the City could prevail only if it proved that the Model trial testimony “played no role,” the jury was clearly (and understandably) confused about whether it could separate Avila’s admitted misconduct as ground for discipline from the protected act of testifying. To try and remedy the problem, the City once again proposed — but the trial judge once again rejected — special instructions that could have cleared up the jury’s confusion on this point.
The majority says that the two special instructions “would have done more to confuse than to clarify”, Maj. Op. at 1103, but it is hard to see how the jury could have possibly been more confused than they already were with the instructions as given. To the extent the special instructions were themselves confusingly-written, the judge could have done what the City had requested as an alternative to giving those instructions: just tell the jurors as he succinctly told the lawyers: “they can’t terminate him for testifying, but they can terminate him if he made an admission that provided separate grounds for termination that arose to good cause.” That simple and uncomplicated clarifying statement would not have confused the jury and would have provided the answer to the problem that had been created by the erroneous instruction.
As it was, however, the trial judge twice instructed the jury that the City, to prove its defense, must show that Avila’s testimony in Maciel “played no role” in the challenged action, which was legally incorrect. Thus, once Avila quite easily met his threshold case, the City did not have the opportunity for the jury to even consider its defense: that it took the action because of the admitted misconduct, and not for the mere act of testifying. I believe this was not only plain error, but it was so closely related to the persuasive special instructions argument that the City has raised that the issue has clearly not been waived.
B.
The majority next maintains that, even if the error had not been waived, the result would not change as there was literally “no evidence” to warrant the “same decision” jury instruction. See Maj. Op. at 1103, 1101 (emphasis in original). With this assertion (and other similar representations), the majority appears to suggest that the evidence at trial was so indicative of retali *1113 ation that the City basically had no defense.[10] A close and careful review of the full trial record reveals that there was ample evidence to support the same decision defense, as the case was much closer than the majority’s opinion suggests. The following evidence was presented to the jury:
The LAPD is a very large municipal employer with approximately 10,000 sworn members. At the time relevant here, it was LAPD “official” policy that any officers who worked through their 45-minute lunch break — generally known as a “Code 7” — should fill out an overtime slip, report it on their Daily Field Activity Report (“DFAR”), and be paid accordingly. DFARs were completed at the end of each shift, and if there were problems with the report as submitted, a “Kick-back Sergeant” would return it the following day to be corrected. Although this was the LAPD’s “official” policy, there were allegations that some supervisors adhered to an “unwritten policy” of coercing and discouraging the officers from reporting any overtime for less than one hour. There were multiple FLSA overtime cases filed against the City involving this allegation, including some large class actions that had thousands of class members. The cases posed “big problems” for the LAPD and exposed it to “huge liability.”
So, in March 2008, and again in June 2005, the LAPD issued two policy memos expressly stating that there was no “unwritten policy” of not being paid overtime and that all overtime hours must be properly reported or the employee would be subject to termination. The officers were further told that if anyone felt pressure or coercion to not report all of their overtime, they had the “affirmative obligation” to report the source of that pressure or coercion, and they could do so anonymously and outside the regular chain of command. The failure to report all overtime and the failure to report supervisors who encouraged such conduct was insubordination, which was considered to be “serious misconduct.”
At some point during this time, the Chief of Police and “top management” made the determination and decision that the LAPD would investigate claims of FLSA violations only where the alleged violators were specifically identified. It was thus incumbent on the individual making the charge(s) to provide adequate information — like names, dates, and times— to facilitate an investigation as the LAPD had limited resources and could not do “fishing expedition” investigations of hundreds (potentially thousands) of unnamed officers and still function as a law enforcement agency. The evidence presented to the jury was that whenever alleged violators were specifically identified, they were investigated by Internal Affairs.
Avila joined the LAPD in 1997, and he was assigned to patrol in the Central Division. He had the “distinct recollection” of having received and reviewed both the March 2008 and June 2005 policy memos. On or about February 23, 2007, he joined one of the ongoing lawsuits against the City and alleged that the LAPD had denied him overtime pay under the FLSA. Roberto Alaniz v. City of Los Angeles, 2:04-CV-8592-GAF (doc. 637).[11]
*1114 In January 2008, almost a year after he joined in the Alaniz lawsuit, Avila testified in the Maeiel litigation. Yvette Bass, a detective with Risk Management for the LAPD, was in the courtroom to observe the trial. While testifying, Avila admitted under oath that for several years he and myriad unnamed “other officers” knowingly and repeatedly violated the FLSA and LAPD “official” policy by not reporting overtime when they worked through their Code 7s. He testified that he did this, even though he knew it constituted “serious misconduct,” because he felt “intimidated” by supervisors who “discouraged” him from requesting overtime in that situation. He never reported any of the supervisors, however, which he knew was separate misconduct. He further testified that he would sometimes put missed Code 7s on his DFARs, but the Kick-back Sergeants would give them back to him the following day and order him to falsify the records. He did not ever report any of the Kick-back Sergeants who allegedly told him to do this, and he testified that he falsified DFARs “over and over again”, even though he knew it was even still more misconduct.[12]
With his trial testimony in Maeiel, Avila implicated potentially hundreds of unnamed supervisors and possibly hundreds of unnamed officers, but he provided almost nothing to support his claims. He readily admits that he never provided any specific dates or times, and he admits that he provided almost no names.[13] In fact, even though he claimed that it had been going on for years, he only identified two supervisors who allegedly pressured him to not report overtime: Sergeant Walker and Sergeant Miyazaki. Sergeant Walker died years before, but Sergeant Miyazaki was still with the LAPD, and, in fact, had also testified in the Maeiel case. During his testimony in that litigation, Miyazaki stated that he had “probably” violated the overtime rules.
Detective Bass reported what she observed at the Maeiel trial, after which an internal complaint was brought against both Avila and Sergeant Miyazaki. The complaint was brought against Sergeant Miyazaki for two reasons: because Avila specifically identified and accused him of misconduct, and (like Avila) “because he might have implicated himself in his own testimony.” During the investigation, Internal Affairs asked Avila multiple times to confirm if his Maeiel testimony had been accurate, and he agreed that it was. Sub *1115 sequently, the charge against him was sustained, as the complaint adjudicator determined (based on his sworn testimony) that he “was clearly aware of the FLSA policies but violated them anyway.” The complaint against Sergeant Miyazaki, meanwhile, was deemed to be unfounded.[14] The adjudicator found as follows with respect to Miyazaki:
Avila’s claim was self-serving. And he made it in court as a plaintiff in a lawsuit [.Alaniz ] against the City for uncompensated overtime.
Avila admitted to being trained on FLSA-related policy and his right to compensation.
Avila’s statement was unsupported by any specific facts, such as, dates, notes, or notifications to other supervisors for what would have been a clear violation of policy.
While not part of the investigation, the adjudicator was personally aware of overtime granted to employees for no Code 7 on a regular basis by supervisors including Miyazaki.
No Code 7 overtime makes up about 3 percent of Central Area’s overtime expenditures. This fact is inconsistent with Avila’s claim that such overtime was routinely denied.
After the investigation, the Chief ordered Avila to a hearing before the BOR. In response, Avila filed a complaint in state court to stop the hearing from moving forward and, in connection with that proceeding, he filed a sworn declaration in which he again: (1) admitted that for years he knowingly failed to report overtime when he worked through his Code 7s, and (2) confirmed that his Maciel testimony was accurate. Ultimately, he lost his bid to stop the BOR from holding its hearing.
Avila appeared at the BOR with counsel to contest the charge. He decided to resign from the LAPD on the first day of the hearing and did not return after the lunch break. Pursuant to BOR procedure and written direction from the Chief, the hearing continued without him for the next three days, during which his attorney fully participated, examined witnesses, lodged objections, put on evidence, and presented his defense. After hearing the evidence, the BOR panel assigned to the case (which was comprised of two LAPD Captains and one civilian) found Avila guilty of “serious misconduct” and recommended termination. He was thereafter “terminated”, even though he had already resigned and his resignation accepted.[15]
*1116 Avila did not appeal the BOR’s determination. Importantly, this means, as the district court had earlier held, that he is “bound by the factual findings of the BOR — that he violated departmental policy and that such insubordination was grounds for termination — and [he] cannot challenge those findings[.]”
With the foregoing in mind, I do not agree that the City had “no evidence” to support the “same decision” affirmative defense. This court has said that, for the proof required to assert this defense, an employer need only have “some objective evidence” that it would have taken the same action notwithstanding the protected activity. See Metoyer v. Chassman, 504 F.3d 919, 939-40 (9th Cir.2007) (citation omitted). Because the inquiry is “an intensely factual one”, mixed motive defenses “are generally for the jury to decide.” Id. at 940 (citation omitted).
I have included these evidentiary details from the record because the majority states “[i]t simply cannot be argued on this record that Avila would have been fired had he not testified.” See Maj. Op. at 1103. In my opinion, the majority fails to draw the critical distinction between the act of testifying and admitting to insubordination while testifying. There is no legal basis for treating the testimony as privileged. An employee is not entitled to full use immunity when he testifies during an otherwise protected proceeding. He can testify without fear of reprisal unless he implicates himself in some manner. Thus, as in this case, where there is evidence before the jury that an employee admitted under penalty of perjury that he was knowingly and repeatedly insubordinate for many years, that testimony is automatically “some objective evidence” for the “same decision” defense. This is because, in such a case, the jury could easily determine that the employer would have done the same thing independent of the fact that the employee had testified (for example, if the misconduct had been discovered in some other way). The jury would, of course, not be required to make such a finding — it might find that the adverse action was retaliatory — but it could, depending on all of the evidence in the case. Accordingly, the “same decision” defense instruction is warranted if an employee admits to misconduct while testifying.
Consider the facts of this case. Avila was a very good (albeit not a “model”) police officer who received favorable performance reviews — even after he sued the LAPD for allegedly violating his FLSA rights. See supra note 11. There does not appear to have been any reason for adverse action against him before he took the stand in Maciel and testified as he did. If the knowing and repeated “serious misconduct” that he admitted to during his testimony is not sufficient evidence to support the same decision defense in and of itself, the logic of that position would necessarily mean that he could have admitted to just about anything — including “widespread beating of civilians” — and still not have been fired as his record was mostly unblemished and did not otherwise warrant discipline. To the extent that the majority suggests there must be “other evidence of the alleged infraction” separate from the admissions on the stand, see Maj. Op. at 1103, that is simply not the law, as even Avila’s counsel conceded in the district court and on this appeal. See supra note 2.
Moreover, even if Avila’s admissions on the stand could not be used as the basis for the “same decision” instruction, there was separate “other evidence” that would qualify. For example, Avila testified in this case that he saw Detective Bass in the courtroom before he testified in Maciel, *1117 and she introduced herself and told him that she was there to watch the trial for Risk Management. Very significantly, Avila has conceded that if he had told her exactly what he was about to testify to, she would have been “required” to report him, and he would have “expect[ed]” to be disciplined. While that pre-testimony conversation with Detective Bass never took place, Avila confirmed the accuracy of his Maciel testimony to investigators after he testified (and before he was fired). If a pre-testimony admission could — according to Avila himself — justify discipline and thus provide a foundation for a “same decision” defense, then his posi-testimony confirmation of those admissions should as well.
Further, the majority’s statement that “[t]he uncontested evidence in this case is that Avila would not have been fired had he not testified”, see Maj. Op. at 1101, is difficult to reconcile with Avila’s own testimony. As just noted, he expressly conceded that if he had said exactly what he testified to in the Maciel case in any other setting then he would have “expect[ed]” the LAPD to discipline him. That concession by itself is sufficient evidence to support the “same decision” defense instruction. Cf. Gilbrook v. City of Westminster, 177 F.3d 839, 855 (9th Cir.1999) (stating “an employee cannot use protected conduct as a shield against a dismissal that would have occurred even in the absence of the protected conduct”).
In addition, the sworn declaration that Avila filed to try and stop the BOR hearing further affirmed that he knowingly violated the LAPD’s official policy by not reporting overtime and not reporting supervisors who allegedly told him to do so. This evidence — separate and apart from his testimony in Maciel — provided other grounds for the “same decision” instruction.
Finally, Avila did not appeal or challenge the BOR’s ruling. Consequently, as the district court held earlier in this case, and as Avila does not dispute on this appeal, he is bound by the BOR’s factual findings, including “that he violated departmental policy and that such insubordination was grounds for termination[.]” This is separate and independent “other evidence” to support the “same decision” affirmative defense.
Thus, even if Avila’s admitted misconduct while testifying was not “some objective evidence” to support the “same decision” instruction all by itself (and I believe it was), there was considerable other evidence at trial: his post-testimony confirmation of the insubordination, his sworn declaration, the legally binding administrative factual findings, and his testimony before the jury in this case that he would have been disciplined if he had said the exact same thing while not testifying. Far from there being “no evidence” to support the City’s affirmative defense, there was, in fact, ample evidence from which a reasonable jury could have found that the City would have made the “same decision” in this case.
C.
As to whether the error here was harmless, both the majority’s opinion and Avila’s brief rely on Lambert v. Ackerley, 180 F.3d 997 (9th Cir.1999) (en banc), which held that the district court’s failure to give a same decision instruction was harmless. Harmless error analysis, of course, “rests on the particular facts” of each individual case. See United States v. Frazin, 780 F.2d 1461, 1471 (9th Cir.1986). What is harmless error in one case “could well, under a different set of facts,” not be considered harmless in another case. See id. It is thus important to compare the facts of Lambert to the facts presented *1118 here, and note the three significant ways in which the cases are very different.
First, as the court recognized, the evidence in Lambert was overwhelming, as it was a “rare” mixed motive case that had direct evidence of retaliation (to wit, a statement from a supervisor that plaintiff would “definitely not have a job” and would “be fired” if she filed a FLSA claim). 180 F.3d at 1008-09. The panel said that the direct evidence “strongly supported]” its harmless error finding. See id.; accord Merritt, 120 F.3d at 1188-91 (concluding that an employee who admits to misconduct while testifying in a protected proceeding may be terminated and the employer will be granted summary judgment, unless there is “direct evidence of retaliatory motive”). There was no direct evidence here, and there was sufficient circumstantial evidence to support a verdict for the City.
Second, the Lambert court found it very important — and spent two pages discussing the fact — that the jury awarded the employee $12 million in punitive damages. See id. at 1009-10 (citing cases where it was held that “an instructional error regarding liability [is] harmless in light of a punitive damages award”). Not only were punitive damages not awarded in this case, but the jury awarded Availa about 1% of the compensatory damages that he sought.[16]
Third, the jurors in Lambert did not ask two sets of multiple questions while deliberating into the third day (after hearing only three days of evidence), strongly suggesting that they were confused by the instructions and having a difficult time reconciling them with the evidence. Cf. Rose v. Lane, 910 F.2d 400, 403 (7th Cir.1990) (stating in a habeas case that involved an erroneous instruction which led to followup jury question: “While this question could have a variety of implications, it indicates possible jury confusion over the manslaughter instructions and therefore contributes to our finding that the instructions were not harmless.”).[17]
In this case, the absence of the “same decision” defense instruction and the inclu *1119 sion of the “no role” instruction had the practical effect of depriving the City of its entire defense. This circuit and several others have held, albeit mostly (but not exclusively) in the criminal context, that an error cannot be found harmless if it “precludes or impairs the presentation of [a defendant’s] sole means of defense.” United States v. Carter, 491 F.2d 625, 630 (5th Cir.1974); see also United States v. Peak, 856 F.2d 825, 834-35 (7th Cir.1988); United States v. Harris, 733 F.2d 994, 1005 (2d Cir.1984); accord United States v. Evans, 728 F.3d 953, 967 (9th Cir.2013) (concluding that trial judge’s erroneous exclusion of the “central piece of evidence” for defendant’s “main defense” and which went to the “very heart” of the dispute could not be harmless, notwithstanding the “overwhelming volume and substance of the government’s evidence”); Ashcraft & Gerel v. Coady, 244 F.3d 948, 949, 954 (D.C.Cir.2001) (holding that trial error in a civil case which went “to the very heart of [the defendant’s] defense” and was “central to [his] defense” could not be deemed harmless “in the absence of any steps by the district court to mitigate the effects of the error”).
The error was not only not harmless, but, it seems to me, objectively plain.
Ill
The FLSA’s anti-retaliation provision serves a noble purpose. However, it does not extend so far as to immunize an employee who takes the stand and admits to serious misconduct. While the public interest may favor a liberal application of retaliation statutes in some cases, it is highly questionable whether that interest is being served here. The inherent unfairness is that the public (i.e., taxpayers of Los Angeles) will be required to pay about $700,000.00 in a case where, because of an erroneous instruction that was twice given (and special instructions that were twice denied), their city was deprived of the chance to defend itself. That error, based on the jury questions, appears to have been outcome-determinative. While reasonable jurors (and judges) may disagree on the merits of this case, what should be beyond disagreement is that the City and its citizens were denied the fundamental right of defense to which they were entitled under the law. Reversible error occurred, and this case should be remanded for a new trial.
I respectfully dissent.

. To be clear, I am not suggesting that a jury necessarily must have believed that Avila was disciplined for his admitted insubordination. He could argue based on the evidence (and he did argue) that the LAPD internal investigation and BOR proceedings were deficient, biased, targeted, and used to retaliate against him — and a properly instructed jury might have agreed. The problem in this case, as will be seen shortly, is that the jury here was not properly instructed.

. Perhaps this is apparent, but in reading the majority's opinion, one could interpret it otherwise, when it states, inter alia: "The only evidence against Avila was his testimony in the FLSA action.... We leave for another day whether use of an employee’s trial testimony is entirely forbidden in an adverse action when there is also other evidence of the alleged infraction!)]’' Maj. Op. at 1103. The clear implication is that use of an employee’s testimonial admission is "entirely forbidden” (he is immune from discipline) unless there is "other evidence of the alleged infraction” (and even then it may still be forbidden). That implication is not the law, as even Avila's counsel recognized at oral argument, when he agreed that an officer could be disciplined if, while testifying during a protected hearing, he admitted to "widespread beating of civilians.” Further, as noted infra, this issue was discussed at trial during argument on the jurors’ questions and everyone — Avila, the City, and the trial judge — agreed that there is a difference between the protected act of testifying and admitting to misconduct while testifying.

. This pattern instruction, which by its very title applied to Title VII cases, was amended last year to omit the "mixed motive” alternative on the basis of the Supreme Court’s decision in University of Texas S.W. Med. Center v. Nassar, - U.S. -, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013), which had analyzed the statutory "because [of]” language and rejected a motivating factor test in the Title VII retaliation context. In reaching this conclusion, the Supreme Court relied on its decision in Gross v. FBL Financial Servs., 557 U.S. 167, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009), which interpreted similar "because of” statutory language and held that a mixed motive instruction was improper under the Age Discrimination in Employment Act. Whether and to what extent Nassar and Gross may have a bearing on retaliation claims under the FLSA is at this point unclear, although the FLSA uses similar statutory “because [of]" lan *1108 guage. Nevertheless, there is, to date, Ninth Circuit authority providing that the mixed motive/motivating factor analysis is available to retaliation claims under that statute. See Knickerbocker, 81 F.3d at 911 & n. 2. Thus, I accept that is still the law in this circuit (as it was at the time of trial in this case), regardless of what the Supreme Court may decide in FLSA retaliation cases in the future.

. The parties do not dispute on appeal that this was a "mixed motive” case. The majority states that the trial judge "gave the City’s requested [mixed motive] instruction,” Maj. Op. at 1101, but that is not accurate. The City requested the mixed motive instruction which included the incorporated “same decision” affirmative defense, as set out in the pattern instruction. The judge significantly changed that instruction, as will be seen.

. It appears that the "no role” portion of the instruction was, in substance, derived from Avila's previously (and properly) rejected "sole cause” instruction. See Costa, 299 F.3d at 856 (describing "sole cause” cases as those in which "the only reasonable conclusion a jury could reach is that discriminatory animus is the sole cause for the challenged employment action or that discrimination played no role at all in the employer’s decisionmak-ing ”) (emphasis added). In mixed motive cases such as this, the employer has no burden to prove that the protected activity "played no role.” See Knickerbocker, 81 F.3d at 911 & n. 2. That language is not even compatible, since in mixed motive cases it is presumed that the activity may have "played a role,” but the employer has the opportunity to try and prove that it would have taken the same action anyway. See Ostad v. Oregon Health Sciences Univ., 327 F.3d 876, 884-85 (9th Cir.2003) (citing Knickerbocker and noting that in a "mixed motive” case the employee must prove that the protected activity was a "substantial or motivating” factor, after which — despite that it was a factor — the employer will prevail if it proves that "the adverse action would have occurred anyway”). If employers in mixed motive cases were required to show, as here, that the protected conduct "played no role” in the action, then no employer could ever prevail on its affirmative defense.

. Avila maintains in his brief that the instruction the trial judge gave was "in substance” the same as the one that the City had requested, but the two are actually contradictory. Requiring the City to prove for its affirmative defense that it would have made the same decision even if the protected activity was a motivating factor is manifestly not the same as requiring the City to prove that the protected activity "played no role.”

. The closest the City comes to making this argument is in its reply brief, where it points out — quite rightly — that it could not have possibly shown that the Maciel testimony played no role in the adverse action when the City’s entire defense was that the action was appropriate based on Avila’s admission “during that testimony! ” (Emphasis in original).

. The majority says "the only issue [for the jury to resolve] was whether the reason given by the LAPD for the termination was a pretext.” See Maj. Op. at 1104 (emphasis added). But, this action was tried as a mixed motive case, not as a sole cause case, so pretext was not an issue at trial. In Stegall v. Citadel Broadcasting Co., 350 F.3d 1061 (9th Cir.2003), this court discussed the differences between the two types of cases and noted “it does not make sense to ask if the employer's stated reason for terminating an employee is a pretext for retaliation” in a mixed motive case; rather, in such cases the first issue is whether the protected activity was a motivating factor in the adverse action, and the second issue is whether the employer would have made the same decision anyway. See id. at 1067-68. As for the first issue, as noted, Avila's trial testimony in Maciel clearly "contributed to” the adverse job action, and, therefore, it was a "motivating factor” in the decision to take the action. As for the second issue, the majority opinion makes no attempt to explain how the jury could have possibly resolved that question in favor of the City in light of the instruction that it was given. It couldn't. The law that the jury was told to follow was wrong — pure and simple — and as a result the City was denied its entire defense, which was plain error.

. Once again, this is incorrect. The “flip side” or "inverse” of a motivating factor is not that the protected conduct "played no role” in the adverse job action. Instead, in mixed motive cases, the employer need only show it would have made the "same decision” regardless of the role that the protected activity did play. See supra note 5.

. The majority states, for example, that "[t]he uncontested evidence in this case is that Avila would not have been fired had he not testified.” See Maj. Op. at 1101 (emphasis added). As will be seen, that is contradicted by the record, including the trial testimony of Avila himself.

. The majority twice refers to Avila as a "model” officer. See Maj. Op. at 1098, 1104. Putting aside the evidence that he had five sustained personnel complaints and was suspended four times (for a total of 18 days) for various misconduct, whether he was a good employee is irrelevant as there *1114 has been no claim that he was fired for being a bad employee. Rather, he was terminated only after — and allegedly because — he admitted under oath that he committed “serious misconduct.’’ And, there is evidence from which a jury could have found that is what happened here. For example, nine months after he joined in the Alaniz lawsuit, Avila received a performance review that said he “possesses a good work ethic’’ and is "courteous and professional,” “dedicated,” "exemplaiy” and "consistently outstanding.” The timing of this very (and exclusively) favorable review would appear to undermine the suggestion that it was his mere participation in a FLSA case against the LAPD, as opposed to his admissions of "serious misconduct” during such case, that led to his termination.

. Since Avila had admitted to knowingly and repeatedly violating policy in three separate ways over many years, there was much more "serious misconduct” at issue in this case than just an officer “periodically work[ing] through his lunch break” and "not seeking all the pay that he might have.” See Maj. Op. at 1098, 1104.

. Avila was not able to name a single Kickback Sergeant, but he was able to provide an estimate of when they allegedly ordered him to falsify his DFARs: sometime between 2004-2006. This did not help narrow the field, however, as the Kick-back Sergeants change almost every day.

. There were some notable distinctions between Miyazaki and Avila. Avila was unequivocal that he had knowingly committed misconduct over several years. Miyazaki testified that he "probably” violated the overtime policy in some manner, but it was unclear how he might have done so. Review of his testimony in Maciel reveals that, to the extent he admitted to violating the official policies, it was very different than what Avila had confessed to. As supervisor, Sergeant Miyazaki had the "affirmative duty” to make reasonable efforts to be sure that his officers were taking (or being paid for working through) their Code 7s. He testified that, due to the demands of being watch commander and confusion as to what his affirmative duty required, he might have violated the policies. But, he strongly denied that he ever discouraged officers from seeking overtime, which the adjudicator accepted, as quoted in the text.

. The majority notes that Officers Romney and Anderson testified adverse to the LAPD in Maciel and they, too, were sent to the BOR and fired. See Maj. Op. at 1098-99 & n. 1. As stated before, both officers — like Avila — admitted to "serious misconduct” under oath. Specifically, Romney admitted that he knowingly failed to report overtime for almost two decades (even after the 2003 and 2005 memos), while Officer Anderson not only admitted to misconduct in her Maciel testimony, but she actually pled guilty to one of the charges against her at the BOR. Romney and Anderson identified supervisors who allegedly violated the overtime policies as well. None of these supervisors admitted to the misconduct (but, rather, denied wrongdoing), and *1116 they were exonerated following internal investigations.

. During closing argument, Avila's attorney had requested $230,000.00 in economic damages and 4.5 million in non-economic damages. The jury gave him $50,000.00.

. Although it is always difficult to try and infer what a jury is thinking with its questions, on the facts of this case, the questions are telling. The jurors astutely asked five related questions that centered on the exact problem that was created by the erroneous instruction. The last two questions asked whether the LAPD could "legally]” use Avila’s testimonial admission against him, and the jurors were not given the answer. If the evidence of retaliation in this case was so overwhelming that the error could be harmless, it is unlikely that the jury would have asked that question on the third day of deliberations. See Thomas v. Chappell, 678 F.3d 1086, 1103-04 (9th Cir.2012) (referencing two "objective clues” that "strongly suggest that the case was close”, namely, the fact that the jurors deliberated into the fifth day and sent two requests that "related specifically” to the issue on appeal, which suggests "the jury actually struggled with that question”; collecting multiple cases involving juror requests and "lengthy deliberations” between two to five days that showed the evidence was close as " ‘one would expect that if the evidence ... was overwhelming the jury would have succumbed much sooner' ”); see also Aguilar v. Woodford, 725 F.3d 970, 984 (9th Cir.2013) (questions and notes over four days of deliberations showed the case was close) (citing Rhoden v. Rowland, 172 F.3d 633, 637 (9th Cir.1999) (deliberations of nine hours over the course of three days indicated that the jury "did not find the case to be clear cut”); Gibson v. Clanon, 633 F.2d 851, 855 n. 8 (9th Cir. 1980) (“it does not seem possible that the jury would have deliberated nine hours over [the course of two] days if the jurors did not have serious questions”)); United States v. Ottersburg, 76 F.3d 137, 140 (7th Cir.1996) (nine hours of deliberations "makes clear that this case was not an easy one for those called to serve as finders of fact”).